IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL CHAVIS *et al.*,

    *Plaintiffs*,

v.

    Civil Action No. ELH-17-2729

PLUMBERS AND STEAMFITTERS
LOCAL 486 PENSION PLAN *et al.*,

    *Defendants*.

**MEMORANDUM OPINION**

This case involves a dispute regarding retirement benefits under an employee pension benefit plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.* In particular, the Court is tasked with review of a decision of the trustees of the Plumbers and Steamfitters Local 486 Pension Plan (the "Plan"), a tax-qualified union pension fund, denying "Service Pension" benefits to plaintiffs Michael Chavis and Stanley Taylorson, Jr.

Plaintiffs are Plan participants through their membership in the Plumbers and Steamfitters Local 486 Union (the "Union").[1] They retired from their Union positions before the age of 62, believing that they qualified for a Service Pension under the Plan. Indeed, they applied for and were approved for those retirement benefits, which they received while continuing to work for their same employer, but in non-Union management positions. The Plan's Board of Trustees (the "Board" or the "Trustees") subsequently suspended plaintiffs' Service Pension benefits. The

---

[1] The parties' submissions refer to both the "Plumbers **&** Steamfitters Local 486" (*see, e.g.*, ECF 46-25 at 2) and the "Plumbers **and** Steamfitters Local 486" (*see, e.g.*, ECF 46-6 at 2) (emphasis added).

Trustees concluded that plaintiffs did not qualify for a Service Pension on the ground that they had not separated from employment, and thus had not experienced a bona fide retirement.

This suit followed. ECF 1 (the "Complaint"). Plaintiffs have sued the Plan as well as several fiduciaries of the Plan: William Welsh, Mark Jackman, Wayne Adkins, Gerard Jackson, Sr., Spencer Matusky, Steve Weissenberger, Joel Meredith, Jeffery Moderacki, Mark Eckstein, Thomas Hayes, Jr., James Estabrook, and Robert Rimel. ECF 1.[2] Plaintiffs asserted claims for wrongful denial of benefits under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B) (Count I); breach of fiduciary duty under § 502(a)(2), 29 U.S.C. § 1132(a)(2) (Counts II and IV); and "equitable relief" under § 502(a)(3), 29 U.S.C. § 1132(a)(3) (Counts III and V). They also seek reinstatement of their pension benefits, removal of defendants as fiduciaries, as well as attorneys' fees under § 502(g), 29 U.S.C. § 1132(g) (Count VI). ECF 1, ¶¶ 136-79.

Defendants previously moved to dismiss the Complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 24. By Memorandum Opinion and Order of April 23, 2018, I granted the motion to dismiss as to Counts III and V of the Complaint, but I denied the motion as to Counts I, II, IV, and VI. ECF 33; ECF 34.

Now pending is plaintiffs' motion for partial summary judgment, limited to Count I, pursuant to Fed. R. Civ. P. 56. ECF 45. The motion is supported by a memorandum of law (ECF 45-1) (collectively, the "Plaintiffs' Motion"), and numerous exhibits. ECF 45-2 to ECF 45-24. Defendants have filed a cross-motion for summary judgment as to all counts (ECF 46), supported by a memorandum of law (ECF 46-1) (collectively, the "Defendants' Motion") and multiple exhibits. ECF 46-2 to ECF 46-31. According to defendants, plaintiffs engaged in "Unauthorized

---

[2] Plaintiffs also sued Dale Troll and Sarah Talerico. But, plaintiffs subsequently dismissed the suit as to them. ECF 31; ECF 32.

Employment" under the Plan, because they have "continuously been employed" in the "same industry, trade or craft and region in which both Plaintiffs were employed prior to their alleged retirement," in direct violation of the terms of the Plan. ECF 46-1 at 14.[3] Plaintiffs filed a combined opposition to Defendants' Motion and a reply in support of Plaintiffs' Motion. ECF 47 (the "Opposition"). They also submitted additional exhibits. ECF 47-2 to ECF 47-9. Defendants have replied (ECF 48, the "Reply") and submitted additional exhibits. ECF 48-2 to ECF 48-13.[4]

In addition, plaintiffs have moved for leave to file a Surreply. ECF 49 (the "Surreply Motion"). The proposed Surreply is at ECF 49-1. The Motion is supported by several exhibits. ECF 49-2 – ECF 49-10. Defendants oppose the Surreply Motion. ECF 50.

---

[3] The Court cites to the electronic pagination, which generally does not correspond to the page numbers printed on the documents.

[4] The parties have submitted numerous exhibits, many of which are lengthy. They have also submitted duplicate exhibits. For example, both sides submitted copies of the 2009 Plan (ECF 45-7; ECF 46-5) and the suspension letters. *See* ECF 45-12, 45-13; ECF 46-13. In this Memorandum Opinion, I do not always reference duplicate exhibits.

The parties' citations to exhibits have caused considerable difficulty, given the volume of exhibits and the extensive briefing. Plaintiffs sometimes cited to exhibits without reference to a number, a letter, or ECF, making it challenging for the Court to wade through the exhibits to locate the correct one. To illustrate, plaintiffs assert: "See Plaintiffs' Statement of Undisputed Facts ('PSUF') Exhibits 3 & 4." ECF 45-1 at 7. The exhibit number for the PSUF was not included.

Moreover, defendants challenged some of the facts in the PSUF. Yet, plaintiffs frequently cited to the PSUF to support many of their assertions, instead of the relevant exhibit. *See*, *e.g.*, ECF 45-1 at 11 ("Taylorson timely appealed the suspension of his Plan pension benefit on October 30, 2012. [PSUF] at ¶ 40."). As a result, the Court had to search among the many exhibits to locate the relevant one. To illustrate, it would have been far more helpful for plaintiffs to have cited directly to the letter of October 30, 2012, which is at ECF 45-14.

The Court experienced similar frustration with defendants' citations. Defendants appended numerous exhibits to the Certification of Elizabeth Manzo, Esquire. *See* ECF 46-4. But, in their lengthy brief, they often do not refer to Manzo's Certification by an exhibit number. *See*, *e.g.*, ECF 46-1 at 9 ("See Exhibit T to the Manzo Cert.)[]".

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Surreply Motion. I shall deny Plaintiffs' Motion. And, I shall grant Defendants' Motion in part and deny it in part.

## I. Factual Background

Many of the facts are undisputed.[5] The parties agree that the case centers on interpretation of the Plan. And, it appears that it is the 2009 Plan that is in issue. *See* ECF 45-1 at 19; ECF 46-1 at 32.

### A. The Plan and the Trust

The Plan authorizes payment of retirement benefits to qualified participants. ECF 46-2, ¶ 1. It is a multiemployer plan, as defined by §§ 3(37)A of ERISA, 29 U.S.C. § 1002(37)(A), and under §§ 515 and 502(g)(2) of ERISA, 29 U.S.C. §§ 1145, 1132(g)(2). *Id.* Therefore, it is

---

[5] Plaintiffs include in their Statement Of Undisputed Facts (ECF 45-2) that on November 21, 2018, they sent requests for admission to the Plan. *Id.* ¶ 1; ECF 45-4; ECF 45-5. Because the Plan never responded, plaintiffs maintain that the requests are deemed admitted as a matter of law under Fed. R. Civ. P. 36(a)(3). ECF 45-2, ¶ 1.

Defendants disagree. ECF 46-3. They point out that in December 2018, the parties jointly moved to amend the Scheduling Order. *See* ECF 43. In that motion, the parties said, *inter alia*, *id.* at 1: "1. Plaintiffs have propounded written discovery in the form of Request for Admissions, Requests for Production of Documents and Interrogatories and 2. Defendants are in the process of responding to Plaintiffs' written discovery and propounding written discovery to Plaintiffs. . . ." The motion also stated that counsel for the parties wanted to postpone expert designations and depositions until after the settlement conference. In order to do so, counsel "recognize[d] that the deadlines for the items [aforementioned] identified . . . must be postponed." *Id.* at 2.

The Court granted that motion. ECF 44. As amended, the deadline for requests for admission was extended to July 5, 2019. *Id.* Defendants explain that they "did not respond to Plaintiffs' Request for Admission in reliance on" the revised deadlines. ECF 46-1 at 9.

Plaintiffs' Motion was filed on March 29, 2019 (ECF 45), before the new discovery deadline set by this Court had passed. ECF 44. Under these circumstances, plaintiffs' requests for admission (ECF 45-4 and ECF 45-5) will not be deemed admitted.

governed by ERISA.  *See* 29 U.S.C. § 1003(a).  It is also a tax-qualified plan under § 401(a) of the Internal Revenue Code ("IRC").  ECF 46-2, ¶ 1.

The Plan was first adopted in 1962, revised in 1974, amended as of 1975, amended and restated on January 1, 2009, amended in 2014, and amended and restated in 2016.  ECF 46-25 at 8; ECF 46-24 at 7; ECF 46-5; ECF 46-6; ECF 46-8.  The 2016 Plan went into effect on January 1, 2016.  ECF 46-8 at 2.

The Plan is governed by and subject to the "Agreement & Declaration of Trust" of Plumbers and Steamfitters Local 486 Pension Fund, as Amended and Restated Effective January 1, 1975 (the "Trust").  ECF 46-25.  Of import here, Article IV of the 1975 Trust expressly states: "It is the intention of the Trustees to be in full and strict compliance with all requirements of the Internal Revenue Code and the Employee Retirement Income Security Act of 1974."  *Id.* at 14.[6]

The preamble to the 2009 Plan is also pertinent.  It specifically provides that it is "subject . . . to such amendments as may be required by the Internal Revenue Service in order that the Plan may qualify as a tax-qualified multi-employer defined benefit pension plan and conditioned on such qualification."  ECF 46-5 at 7.

The 2016 Plan provides that the Plan "applies to all active Participants who have one or more Hours of Service on or after that date."  ECF 46-8 at 7.  Of pertinence here, it also states that the "rights, benefits and interests of any employee who . . . retired or otherwise terminated his or her employment . . . prior to January 1, 2016, shall be determined under the provisions of the Plan

---

[6] Defendants also submitted as an exhibit the "Reaffirmation & Restatement Agreement & Declaration Establishing the Trust of Plumbers & Steamfitters Local 486 Pension Fund," dated March 22, 2018.  ECF 46-24.  The document reaffirms the Trust, as amended.  *Id.* at 8.  In the 2018 Trust document, Article III (not Article IV) states, in part, *id.* at 14: "It is the intention of the Trustees to be in full and strict compliance with all requirements of the [IRC] and the [ERISA] of 1974, as amended."

as in effect on the date such former employee . . . retired or otherwise terminated . . . employment . . . ." *Id.* at 7-8.

The parties seem to agree that the 2009 Plan governs here, rather than the 2016 Plan. *See* ECF 45-1 at 19; ECF 46-1 at 32. In particular, plaintiffs assert that "the 2009 Plan governs plaintiffs' plan benefit entitlements and claims for benefits." ECF 45-1 at 19. For their part, defendants state that "the 2009 Plan, as Amended, ERISA, and the Internal Revenue Code" govern plaintiffs' claims. ECF 48 at 16. Plaintiffs maintain that the amendments to the 2009 Plan that were approved in 2014 cannot apply to them because they retired prior to 2014. ECF 45-1 at 18.

The Plan is administered by the Trustees. According to defendants, the Board consists of both employer and union trustees. ECF 46-1 at 9. Pursuant to Section 9.10 of the 2009 Plan, titled "Administrative Authority," ECF 46-5 at 95, the Trustees "shall have the sole responsibility for and the sole control of the operation and administration of the [P]lan[.]" *Id.* In addition, the 2009 Plan states, *id.* at 95-96:

> [The Board] shall have the power, discretion and authority to take all action and to make all decisions and interpretations which may be necessary or appropriate in order to administer and operate the Plan, including . . . the power, duty, discretion and responsibility to:
>
> > (a) Resolve and determine all disputes or questions arising under the Plan, including the power and discretion to determine the rights of Employees, Participants and Beneficiaries, and their respective benefits, and to remedy any ambiguities, inconsistencies or omissions.

Article VII of the 1975 Trust is titled "Powers And Duties of the Trustees, Expenses And Fees." ECF 46-25 at 25. Section 1(d) of Article VII confers on the Trustees the duty, *inter alia*, to "formulate and establish the conditions of eligibility with respect to age and length of service, qualifications for early retirement, conditions for vesting prior to normal retirement date, past and future service benefit credits, [and] the method of providing pensions. . . ." *Id.*

Article I of the 2009 Plan is titled "Definitions." ECF 46-5 at 8. Several definitions are pertinent.

Section 1.10 defines "Covered Employment" as "employment of an Employee by an Employer for which the Employer is obligated by its Collective Bargaining Agreement, or other written agreement, to contribute to the Fund." ECF 46-5 at 11. Benefits are accrued for each "Hour of Service" for which a covered employee works.

Under Section 1.15(a), "Hour of Service" is defined, in part, as "[e]ach hour for which an Employee is paid, or entitled to payment for the performance of duties in Covered Employment for the Employer during the applicable computation period." ECF 46-5 at 12. In Section 1.15(b), "Hour of Service" also includes "[e]ach hour for which an employee is paid or entitled to payment" for "a period of time in which no duties are performed . . . due to vacation, holiday, illness, incapacity. . . layoff, jury duty, military duty or leave of absence." *See id.*

Section 1.15(e)(1) states: "Hours of Service under subsections (a), (c) and (d) above shall be determined from Fund records. Hours of Service under subsection (b) above, shall be determined in accordance with Department of Labor Regulation Section 2530.200b-2(b)." *Id.* at 14. Thus, the text of the 2009 Plan specifically contemplates Department of Labor Regulation Section 2530.200b-2(b) as applicable to Section 1.15(b).

Section 1.18 generally defines "Normal Retirement Age." That age is specified as 62. ECF 46-5 at 14-15.

Article III of the Plan is titled "Pension Eligibility And Amounts." *Id.* at 22. Section 3.02 states: "A Participant may retire on a Normal Pension if he or she attains Normal Retirement Age." *Id.* at 22.

A Plan Participant may also retire on a Service Pension, described in Article III, Sections 3.04-3.05. *Id.* at 26. For eligible participants, the Service Pension benefit is not reduced by reason of retiring before the Normal Retirement Age, as defined by the Plan. *Id.*, Section 3.05. Under Section 3.04(b), the eligibility requirements for a Service Pension include the attainment of: (1) Age 55; and (2) at least 30 Pension Credits. *Id.*[7]

Sections 3.06 and 3.07 refer to Early Retirement Pension. This Section is not implicated here, although retirement before age 62 is sometimes described as early retirement.

Article VII of the Plan is titled "<u>Applications, Benefit Payments And Retirement</u>." Section 7.03 is titled "<u>Action of Trustees</u>." ECF 45-7 at 67. It provides, *inter alia*, that the Trustees are "subject to the requirements of the law" and that they are "the sole judges of . . . the application and interpretation of this Plan. . . ." *Id.* Moreover, their decisions are "final and binding on all parties." *Id.*

Section 7.06 provides, ECF 46-5 at 60-61:

> **Section 7.06** <u>Retirement</u>.
>
> (a) <u>Voluntary Retirement</u>. Retirement under this Plan shall be voluntary. An Employee who continues to work after he or she attains his or her Normal Retirement Age may continue to accumulate pension credits.
>
> (b) <u>Unauthorized Employment of Participants and Pensioners</u>. The employment, including self-employment, of a Participant or Pensioner subsequent to the time the payment of benefits commence or would have commenced if the Employee has not remained in or returned to employment shall be deemed "Unauthorized Employment" during a calendar month, or during [the] four-or-five week payroll period ending in a calendar month, if the Pensioner in such month or in such payroll period ending in a month completes 40 or more Hours of Service in:
>
> > (1) an industry in which Employees covered by the Plan were employed and accrued benefits under the Plan as a result of such

---

[7] A Participant is credited with one "Pension Credit" for every 1,400 of Hours within the Plan Year. *See* ECF 46-5 at 31-32, Section 4.01(b).

employment at the time that he or she reached Normal Retirement Age or retired, if earlier;

(2) a trade or craft in which the Participant or Pensioner was employed at any time under the Plan; and

(3) the geographic area covered by the Plan at the time he or she reached Normal Retirement Age or retired, if earlier.

Anything herein to the contrary notwithstanding, employment of a Pensioner in Covered Employment shall not be considered Unauthorized Employment, provided that such employment is at the request of the Business Manager of the Union because there is "Full Employment" in the plumbing and steamfitting industry within the geographical jurisdiction of the Union, and provided further, that the Pensioner notifies the Fund Office, in writing, within 15 days after the commencement of such employment, that he or she has undertaken such employment. Full Employment is achieved when there are no Participants registered with the Union as "out-of-work" who are available and willing to work in Covered Employment.

Section 7.07, titled "Suspension of Benefits," provides, in relevant part, ECF 46-5 at 61-62:

**Section 7.07** Suspension of Benefits.

(a) General Rule. When a Participant or Pensioner is employed in Unauthorized Employment as that term is defined in Section 7.06, his or her pension benefit shall be suspended for each calendar month of such employment.

(b) Resumption of Payment. When a Pensioner's benefit payments are suspended pursuant to subsection (a) of this Section, payments shall resume no later [than] the first day of the third calendar month after the calendar month in which the Participant or Pensioner ceased to be employed in Unauthorized Employment, provided that the Participant or Pensioner has notified the Fund Office in writing that he or she has ceased such employment. The initial payment upon resumption shall include the payment scheduled to occur in the calendar month when payments resume and any amounts withheld during the period between the cessation of Unauthorized Employment and the resumption of payments, less any amounts which are subject to offset.

(c) Offset Rules. A sum, not to exceed, in any one month, 25% of that month's total benefit (excluding the initial payment described in subsection (b) of this Section, which may be subject to offset without

limitation), which would have been due but for the offset, shall be offset from payments made. The Trustees may also offset, pursuant to these rules, from payments due the spouse or Beneficiary of a Participant or Pensioner who dies before the full recoupment of payments made during Unauthorized Employment is accomplished.

Section 7.12 of the Plan is noteworthy. It is titled "<u>Limitations on Benefits under Section 415</u>" (ECF 46-5 at 67) and states, *id.*:

In addition to any other limitations set forth in the Plan and notwithstanding any other provisions of the Plan, effective for Limitation Years beginning on and after January 1, 2008, benefits under the Plan shall be limited in accordance with Section 415 of the [Internal Revenue] Code[8] and the Treasury Regulations thereunder, in accordance with this Section. This Section 7.12 is intended to incorporate the requirements of Section 415 of the Code by reference except as otherwise specified herein.

Section 9.02 of the Plan, titled "<u>Employment Rights</u>," states, ECF 46-5 at 93:

<u>Employment Rights</u>. The employment rights of an Employee shall not be enlarged or affected by reason of the provisions of this Pension Plan.

Article X of the Plan is titled "<u>Amendments</u>." ECF 46-5 at 96. Section 10.01 authorizes the Trustees to amend the Plan "at any time," and retroactively, subject to certain conditions. These include, *id.*, that an amendment cannot "change the vesting schedule under Section 3.08" without providing certain options to affected employees (§ 10.01(d)), and an amendment cannot "divest" any employee of "any accrued benefit," except pursuant to IRC § 412(c)(8). *See id.*, § 10.01(c)).

On October 9, 2014, the Board enacted two amendments to the 2009 Plan (the "2014 Amendments"). ECF 46-6. The first, effective November 1, 2014, amended Article VII, Section 7.06, titled "Retirement," to revise Section 7.06(b), as follows, *id.* at 2:

(b)  Unauthorized Employment of Participants and Pensioners. The employment, including self-employment, of a Participant or Pensioner subsequent

---

[8] "Code" is defined in Section 1.08 of the Plan to mean the Internal Revenue Code. ECF 46-5 at 10. I discuss Section 415, *infra*.

to the time the payment of benefits commence or would have commenced if the Employee has not remained in or returned to employment shall be deemed "Unauthorized Employment" during a calendar month, or during four-or-five week payroll period ending in a calendar month, if the Pensioner in such month or in such payroll period ending in a month completes 40 or more Hours of Service in:

      (1) an industry in which Employees covered by the Plan were employed and accrued benefits under the Plan as a result of such employment at the time that he or she reached Normal Retirement Age or retired, if earlier;

      (2) a trade or craft in which the Participant or Pensioner was employed at any time under the Plan; and

      (3) the geographic area covered by the Plan at the time he or she reached Normal Retirement Act or retired, if earlier.

In accordance with the Department of Labor regulations, the industry as described above is deemed to be the mechanical contracting and servicing industry. The trade or craft as described above includes trade design work and supervisory employment such as Project Managers and other supervisors, company ownership of a company with less than 25 employees, and any supervisors below the executive level of a company with 25 or more employees.

And second, effective January 1, 2015, the Trustees added Section 7.06(c). *Id.* at 3. It is titled "Unauthorized Employment Prior to Normal Retirement Age." *Id.* It states, in part, that a participant or pensioner under age 62 engages in unauthorized employment if he or she completes 40 or more Hours of Service in a calendar month "in any capacity for an employer who is a mechanical contractor (i.e., work for any mechanical contractor, union or non-union) in any geographical jurisdiction." *Id.*

As noted, in 2016, the Trustees again amended and restated the Plan. ECF 46-8. The 2016 Plan text reflects the 2014 Amendments to Section 7.06.[9]

---

[9] Plaintiffs assert that defendants filed different versions of the 2016 Plan with their Motion to Dismiss and Defendants' Motion. ECF 47-1 at 30-31. They claim that defendants modified the version of the 2016 Plan attached to their summary judgment motion "to include the suspension of benefits language Defendants believe help their cause – and: (i) took the signature page from the 2017 version of the 2016 Plan; (ii) used white-out to remove the '3' in the page number '113;'

## B. The Plaintiffs

Taylorson was born in 1954. ECF 46-9 (Application for Retirement Benefits).[10] Through his membership in the Union, Taylorson became a Plan participant in 1980. ECF 45-23 (Taylorson Affidavit), ¶ 2; ECF 46-9. As a member of the Union, Taylorson installed, maintained, and repaired HVAC and refrigeration systems. ECF 1, ¶ 75. Taylorson avers that he later "satisfied the eligibility requirements under the Plan to receive Service Pension benefits." ECF 45-23, ¶ 3.

---

and (iv) [sic] hand wrote a number '4' where the number '3' used to exist." *Id.* at 31. In their view, that version is "fraudulent." *Id.*

Defendants explain that "two versions of the 2016 Plan exist as a result of a scrivener's error." ECF 48 at 21. Initially, the language from the 2014 amendment was inadvertently omitted from the 2016 Plan. ECF 48-9, ¶ 10. The Board corrected this omission in a version of the 2016 Plan signed on October 22, 2015. *Id.* The original 2016 Plan, containing the error, was mistakenly attached to Defendants' motion to dismiss. *Id.* ¶¶ 13, 15.

Plaintiffs do not meet the "very high bar" of a fraud on the court. *Fox et rel. Fox v. Elk Run Coal Co.*, 739 F.3d 131, 136-37 (4th Cir. 2014). To be sure, a precise definition of "fraud on the court" is "elusive." *Great Coastal Exp., Inc. v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 675 F.2d 1349, 1356 (4th Cir. 1982). But, it is a "nebulous concept" that is "construed very narrowly...." *Id.* Clearly, it "is not your 'garden variety fraud.'" *Fox*, 739 F.3d at 135 (citation omitted). As the Fourth Circuit has explained, *id.* at 136, "not only must fraud on the court involve an intentional plot to deceive the judiciary, but it must also touch on the public interest in a way that fraud between individual parties generally does not."

Notably, "this doctrine should be invoked only when parties attempt 'the more egregious forms of subversion of the legal process ..., those that we cannot necessarily expect to be exposed by the normal adversary process.'" *Id.* (quoting *Great Coastal*, 675 F.2d at 1357); *see Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245-46 (1944); *see also* 12 JAMES WM. MOORE ET AL., Moore's Federal Practice ¶ 60.21[4][a] (3d ed. 1999) (stating that fraud upon the court encompasses an attempt to corrupt the "integrity of the normal process of adjudication"). These "egregious cases" include "bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged." *Great Coastal Exp., Inc.*, 675 F.2d at 1356. In particular, establishing fraud on the court involves "corruption of the judicial process itself" and does not apply to a "routine evidentiary conflict." *Fox ex rel. Fox*, 739 F.3d at 136 (internal quotations omitted).

---

[10] This document contains sensitive personal information. Therefore, I shall order it to be placed under seal, and defendants shall be ordered to file a redacted version.

On June 11, 2009, at the age of 55, Taylorson submitted an "Application For Retirement Pension." ECF 46-9. At the time, Taylorson was working in Union-covered employment with Johnson Controls, Inc. ("Johnson Controls"). ECF 45-23, ¶ 4. In his application, he certified that, as of June 1, 2009, he would "retire and permanently withdraw from employment in the Plumbers & Steamfitters Industry within the State of Maryland and any intersecting metropolitan areas." ECF 46-9. He avers that, upon "severing [his] Union covered employment on June 11, 2009, [he] stopped accruing any benefits under the Plan", and no longer accrued an "Hour of Service" under the Plan. ECF 45-23, ¶¶ 11, 12.

On June 15, 2009, Taylorson accepted a non-Union management position with Johnson Controls. ECF 45-23, ¶ 14. On August 27, 2009, the Board of Trustees "approved [his] retirement under the Plan." *Id.* ¶ 15; see ECF 46-2, ¶ 17 (Defs.' Statement of Undisputed Facts). Taylorson was informed of the approval by letter dated September 1, 2009. ECF 45-8 at 19.

Taylorson avers that before he applied for his Service Pension, he spoke with Thomas Hayes and Dale Troll. *Id.* ¶ 5. According to plaintiffs, Hayes was a Board Member and Troll was the Plan's third-party administrator. ECF 45-1 at 8. Taylorson claims that he asked if his "working in a non-Union management position with Johnson Controls after [he] retired under the Plan would have any affect on [his] receiving [his] Service Pension Benefit." ECF 45-23, ¶ 5. According to Taylorson, both Hayes and Troll told him that working for Johnson Controls in a non-Union position would not affect his Service Pension benefit. *Id.* ¶ 6.

Further, Taylorson maintains that, prior to the Board's approval of his retirement, he informed Hayes and Troll that he had accepted a non-Union management job with Johnson Controls. *Id.* ¶ 7. Moreover, he claims that he accepted the non-Union management position with Johnson Controls in reliance on the representation of Hayes and Troll that it would not affect his

eligibility for his Service Pension benefit. *Id.* ¶ 14. Taylorson represented in a letter of October 30, 2012: "I even met with our business manager Tom Hayes and spoke with him about me taking a management job with Johnson Controls prior to my retiring. . . ." ECF 45-14 at 2.[11] Further, Taylorson asserts that although his non-Union compensation from Johnson Controls is less than he earned in his Union job, he was willing to take the reduction in pay because his Service Pension would "subsidize" his non-Union compensation. ECF 45-23, ¶¶ 18, 19.

Hayes avers that he "does not recall any [such] conversations" with Taylorson. ECF 46-26 at 27. In an interrogatory response to plaintiffs, defendants denied the statements that plaintiffs attributed to Hayes. ECF 46-3 at 3, ¶ 10. And, as to Troll, who is no longer a party to this case, defendants said that they "are neither in a position to admit nor deny as to statements attributed to Mr. Troll" and therefore they "leav[e] Plaintiffs to their proofs." *Id.* ¶ 11.

Taylorson's Service Pension benefit commenced on September 1, 2009. ECF 45-8 at 19; ECF 45-23, ¶ 16. He was paid a monthly benefit of $2,330.00. ECF 45-8 at 11. Taylorson received his Service Pension benefit from September 1, 2009 to October 1, 2012. ECF 45-23, ¶ 20. He reached the Normal Retirement Age of 62 in 2016.

Chavis became a member of the Union in April 1982, and he became a Plan participant in 1985. ECF 1, ¶¶ 20, 22; ECF 46-10 at 2 (Application for Retirement Benefits). Chavis's Union work was mechanical in nature, involving installation, repair, and replacement of HVAC and refrigeration systems. ECF 1, ¶ 21.

Born in 1956 (ECF 24-3 at 132), Chavis became eligible for a Service Pension under the Plan on October 1, 2011. ECF 45-24 (Affidavit of Chavis), ¶ 3. Like Taylorson, Chavis was

---

[11] As discussed, *infra*, defendants dispute receipt of Taylorson's letter of October 30, 2012.

working in Union-covered employment with Johnson Controls at the time he applied for a Service Pension on October 6, 2011, at the age of 55. *Id.* ¶ 4; ECF 46-10.

Chavis certified in his application that as of October 29, 2011, he would "retire and permanently withdraw from employment in the Plumbers & Steamfitters Industry within the State of Maryland and any intersecting metropolitan areas." ECF 46-10. He retired from Union employment on October 29, 2011. ECF 45-24, ¶ 10. Chavis contends that since that time, he has not accrued an "Hour of Service" or any benefits. *Id.* ¶¶ 11, 12.

On November 1, 2011, Chavis accepted a non-Union management position with Johnson Controls. *Id.* ¶ 14. The Trustees approved Chavis's Application for retirement under the Plan on December 29, 2011. *Id.* ¶ 15. Chavis's Service Pension benefit commenced on January 1, 2012, *id.* ¶ 16, in the sum of $2,038.00 per month. ECF 45-10 at 2. Chavis received his Service Pension benefit from January 1, 2012 until October 1, 2012. ECF 45-24, ¶ 20. In 2018, he turned 62 years of age.

Chavis avers that, prior to accepting a non-Union management position with Johnson Controls, he verified with Hayes and Troll that it would not affect his entitlement to his Service Pension. ECF 45-24, ¶¶ 5–7. Moreover, he claims that he took the non-Union management position in reliance on their representations that it would not affect his eligibility for a Service Pension benefit. *Id.* ¶ 8. A handwritten notation on Chavis's retirement paperwork states: "Will be taking a position in mngt with Johnson." ECF 45-10 at 15.[12] And, in Chavis's correspondence of November 19, 2012, discussed *infra*, Chavis stated: "I spoke to **Dale Troll,** our pension fund manager, and **Tom Hayes,** local 486 business manager. Both positively assured me that I could

---

[12] The page on which the handwritten notation appears is dated October 31, 2011, but it is unclear when the notation was made.

and would collect the pension plan and would not lose it if I accepted the management position."
ECF 45-15 at 2 (emphasis in original).

Hayes "does not recall any conversations" with Chavis. ECF 46-26 at 9. In an interrogatory response to plaintiffs, defendants deny the statements attributed to Hayes, and assert that they "are neither in a position to admit nor deny statements attributed to Mr. Troll and therefore deny the same leaving Plaintiffs to their proofs." ECF 46-3 at 4, ¶¶ 25, 26.

### C. Suspension of Benefits and Appeals

At the time of their retirements, both Taylorson and Chavis were working in Union positions with Johnson Controls. After their retirements, both continued to work for Johnson Controls, but in non-Union, management positions. According to plaintiffs, their non-Union compensation is significantly less than the compensation they had earned in their Union employment. ECF 45-23, ¶¶ 18-19; ECF 45-24, ¶¶ 18-19. They anticipated that their Service Pension benefits would subsidize their compensation. *Id.*

In May 2012, the Fund sent letters to various retirees, including Taylorson and Chavis, to update "the employment of current retirees" of the Union. Pensioners were asked to complete a form concerning their employment. ECF 46-11; ECF 46-12.

Taylorson completed the form on May 29, 2012, indicating that he was working for Johnson Controls. ECF 46-11. He gave his position as "Chiller Team Manager" and noted that he was "responsible for team financials." *Id.*

Chavis completed the form on May 25, 2012. ECF 46-12. He also indicated he was working for Johnson Controls. *Id.* Chavis provided a job title of "Service Team Manager," and indicated that he "managed the financials and administration staff for the supermarket refrigeration business." *Id.*

On September 28, 2012, about three years after Taylorson began to receive a Service Pension benefit, and about a year after Chavis first received his Service Pension, Kimberly Bradley, Esquire, counsel for the Board, sent virtually identical letters to Taylorson and Chavis, suspending their pension benefits. ECF 46-13. The letters stated, *id.* at 2, 9:

> [I]t appears that you continued to work for the same employer from the time of your retirement to the present. However, at the time of your retirement, you certified on your pension application that you intended to terminate employment permanently. The Internal Revenue Code provides that a retiree who is younger than age 62 must have a "bona fide retirement" in order to receive pension benefits from a qualified plan. 26 U.S.C. § 401(a). The IRS requires that in order to receive a distribution from a qualified plan, you "must have experienced a bona fide termination of employment in which the employer/employee relationship is *completely severed*." IRS Information No. 2000-0245. (Emphasis in letter)

The letters noted that because Taylorson and Chavis had "continued to work for the same employer, the Pension Fund must suspend [their] pension benefits until [they] reach age 62 or permanently terminate all employment with [their] current employer." *Id.* at 2, 9. Plaintiffs were given 60 days to "request reconsideration" of the Trustees' decision to suspend their pension benefits. *Id.* at 3, 10. Copies of Sections 7.06, 7.07, and 7.08 of the 2009 Plan were attached to both letters. *Id.* at 4–8, 11–15.

Taylorson maintains that he appealed on October 30, 2012. *See* ECF 45-14 at 2. He asserts that in his appeal, he stated that he had obtained approval of his non-Union employment from Hayes, and explained that his current employment is a management position, and therefore was not in the "trade or craft" in which he was previously employed. *Id.*

Defendants maintain that they have no record of Taylorson's appeal. They assert that the first written correspondence received from Taylorson was an undated letter requesting an update on his appeal. ECF 46-1 at 31 n. 6; ECF 46-31 at 2. Nor do they indicate the date of receipt of ECF 46-31.

Plaintiffs counter that defendants received Taylorson's appeal of October 30, 2012. They point to a copy of the letter produced by defendants during discovery, bearing defendants' Bates stamps. ECF 47-6 at 2; ECF 47-1 at 35-37.[13]

It is undisputed that Chavis wrote to Troll on November 19, 2012, appealing the suspension of his benefits. ECF 45-15 at 2. He stated, *inter alia*, that he had relied on the representations of Hayes and Troll in accepting a management position with Johnson Controls. *Id.*

The Board of Trustees met on December 27, 2012. ECF 46-14. They discussed retaining the law firm of Johnson & Krol, LLC ("Johnson & Krol" or "J&K") to provide opinions on pensioners' entitlement to pension benefits. *Id.* at 3. The Fund retained J&K in March 2013 for that purpose. ECF 46-1 at 42. On July 2, 2013, Johnson & Krol submitted a 15-page "Memorandum" to the Board of Trustees concerning multiple retirees. ECF 46-15. However, the firm acknowledged that it made no "independent verification of the facts . . . ." *Id.* The Memorandum said, in part, *id.* at 2–3 (emphasis added):

> It should also be pointed out that eligibility for a distribution is also dependent on the participant having a severance from employment (also known as separation) as required under the Code . . . . Accordingly, a participant who leaves covered employment, but continues to work for the same employer in another capacity has not had a severance from employment and thus, is not eligible for a pension.
>
> Generally, the provided files do not contain information regarding the pensioner's last employer. *For the purposes of this memorandum, we assume that a severance occurred and as a result, we do not address the issue of separation in our analysis below*.

As to Chavis and Taylorson, J&K noted that both worked for Johnson Controls. *Id.* at 7. The Memorandum also stated that because Chavis "is supervising administrative staff and

---

[13] As defendants correctly observe, "whether Taylorson even filed a timely appeal … is a [disputed] question of fact." ECF 46-1 at 31 n.6.

managing financials, there is no indication that he is currently supervising employees working in the Piping Industry or that he accrued benefits under the Plan for performing this type of work." *Id.* J&K recommended as follows: "Do not suspend." *Id.*

Similarly, the Memorandum related that because Taylorson "works with financial information and the management of administrative personnel, it appears that he is not currently supervising employees working in the Piping Industry or that he accrued benefits under the Plan for performing this type of work." *Id.* Therefore, the recommendation was as follows: "Do not suspend." *Id.* But, as Johnson & Krol indicated, the files did "not contain information regarding the pensioner's last employer." *Id.* at 2-3.

The Board of Trustees met on August 22, 2013. ECF 46-16 at 2. The minutes reflect that Bradley wrote to J&K for more information, and that a meeting to review the Memorandum would be scheduled upon receipt of the information. *Id.* at 2-3. Defendants have submitted as exhibits Board minutes from September 26, 2013 (*id.* at 5); October 31, 2013 (*id.* at 8); November 21, 2013 (*id.* at 11); December 19, 2013 (*id.* at 13); January 23, 2014 (*id.* at 16); February 27, 2014 (*id.* at 19); March 27, 2014 (*id.* at 23); April 24, 2014 (*id.* at 26); May 22, 2014 (*id.* at 29); June 26, 2014 (*id.* at 33); July 17, 2014 (*id.* at 37); August 28, 2014 (*id.* at 40); September 18, 2014 (*id.* at 44); and October 23, 2014 (*id.* at 47). These minutes reflect an ongoing dialogue between the Board and J&K regarding suspension of pension benefits, the Memorandum written by J&K, as well as additional information the Trustees sought from the law firm. And, the minutes reference an additional report from the law firm on January 2, 2014 (*id.* at 19) and a final report requested by the Trustees (*id.* at 20).[14]

---

[14] The record does not contain a report labeled as a final report.

Chavis and Taylorson do not appear to be mentioned in the minutes. The minutes of October 23, 2014 state: "The Trustees had a special meeting on October 9, 2014, to make final decisions on what constitutes suspendable employment." ECF 46-16 at 47.

In the interim, in a Memorandum to the Plan dated January 2, 2014, J&K advised that, due to the logistical difficulty of investigating circumstances around retirements that occurred prior to 2012, the Trustees should enforce the separation from employment requirement "on a prospective basis." ECF 45-17 at 2. Presciently, J&K said: "[T]he potential reversal of several years of pension payments is likely to invite litigation by the affected participants." *Id.* Further, J&K noted that an employee could be "considered to have severed from employment even though he subsequently is re-employed" if there was "no prearrangement" with the employer to return to work. *Id.* Plaintiffs maintain that there was prearranged approval from Hayes and Troll.

Plaintiffs also point to an email from Bradley to defendant Spencer Matusky dated November 1, 2013. Bradley stated that, "based on the evidence that is in the possession of the Pension Fund," J&K determined that there was no issue with plaintiffs' Service Pension benefits. ECF 45-18 at 2.

Defendants assert: "The Trustees reviewed the Johnson & Krol Report, gathered additional information, discussed it over multiple Board of Trustees Meetings, and ultimately made independent conclusions to either suspend or reinstate the pensions of certain retirees. Plaintiffs' pensions were among those retirees whom the Trustees determined were not to be reinstated." ECF 46-1 at 30-31.

By correspondence of November 12, 2015 (ECF 46-17), the Fund denied Taylorson's request for reinstatement of his pension benefits. The Fund explained that his continued employment with Johnson Controls constituted "Unauthorized Employment" under Section 7.06

of the Plan and Department of Labor regulations.  *Id.* at 2.  The letter gave Taylorson 60 days to file for reconsideration by the Trustees.  *Id.*

The Board of Trustees sent a letter to Taylorson on February 22, 2016 (ECF 45-19), denying Taylorson's appeal.  *Id.*  The Trustees stated, in part, *id.* at 2 (emphasis added):

> Department of Labor regulations and Section 7.06 of the Plan Document state that unauthorized employment which causes a suspension of pension benefits is comprised of employment in the industry, trade or craft, and geographical jurisdiction of the Plan.  Both the federal regulations and the Plan provide that unauthorized employment includes supervisory employment such as project managers.  Section 7.06 of the Plan Document provides that working in the trade or craft is defined as work by "*any supervisors below the executive level of a company with 25 or more employees.*"  It also provides that the industry is defined as the "mechanical contracting industry."  The geographical jurisdiction is the jurisdiction in which the contributing employers to the Plan are located.  The information that you presented and the letter that your employer presented to the Board of Trustees demonstrate that you are working for a contributing employer to the Pension Plan in the mechanical contracting industry as a supervisor below the executive level for an employer with more than 25 employees.  Therefore, under the terms of the Plan, the Trustees determined that your benefit must be suspended because you are working in unauthorized employment.

Plaintiffs assert, ECF 45-1 at 12: "The language 'any supervisors below the executive level of a company with 25 or more employees' was added to the 2009 Plan § 7.06 *via* the [2014 Amendments] to the 2009 Plan . . . . The [2014 Amendments were] adopted on October 9, 2014, with an effective date of January 1, 2015 – more than five years after Taylorson's Service Pension commenced."

On December 12, 2016, Matthew Olson, Esquire sent lengthy letters to the Plan on behalf of both Taylorson and Chavis.  ECF 46-18; 46-19.  The letter on behalf of Taylorson contended, *inter alia*, that the Trustees had breached their fiduciary duty in denying his appeal.  ECF 46-18 at 2.  The letter on behalf of Chavis noted that the Trustees had not yet rendered a decision with regard to his appeal.  ECF 46-19 at 3.

The Trustees wrote to Chavis on April 4, 2017, denying his appeal. ECF 45-20. A copy of Section 7.06 of the 2016 Plan was appended. The Trustees stated that because Chavis "did not completely sever the relationship with [his] employer," he was not entitled to receive a Service Pension. *Id.* at 1. Further, the Trustees said, *id.*:

> In the event that the IRS determines that you were not entitled to a distribution at the time of your retirement, you will be required to repay all monthly pension benefits received from the date of your retirement until the date of your suspension of benefits, with interest. . . . [T]he Trustees have not yet made a determination regarding the work that you are performing and whether it constitutes unauthorized employment under the terms of the Plan, because the requirements of the Internal Revenue Code do not permit you to receive a distribution prior to Normal Retirement Age if you have not incurred a bona fide retirement.

Plaintiffs complain that the letter was untimely. ECF 45-1 at 17. They add that it failed to "cite a single Plan provision" to support its determination. *Id.*

Also on April 4, 2017, the Trustees sent a letter to Taylorson. ECF 46-22. They stated that the Trustees "voted to conditionally approve [his] request to reinstate [his] benefit as of the date upon which [he] reached Normal Retirement Age under the provisions of the Plan Document, upon receipt of information regarding [his] current job description that shows that [he is] not working in unauthorized employment." *Id.* at 2. The letter cited Section 7.06 of the 2016 Plan, defining "working in the trade or craft for those participants who are at or beyond the Normal Retirement Age. . . as work 'by any supervisors below the executive level of a company with 25 or more employees.'" *Id.* The 2016 version of Section 7.06 was attached to the letter.

Additional facts are included in the Discussion.

## II.    Legal Principles[15]

### A.  ERISA and the Internal Revenue Code

ERISA was "enacted to protect the interests of participants in employee benefit plans and their beneficiaries…." *Marks v. Watters*, 322 F.3d 316, 322 (4th Cir. 2003); *see Borden, Inc. v. Bakery & Confectionery Union & Indus. Int'l Pension*, 974 F.2d 528, 529 (4th Cir. 1992); 29 U.S.C. § 1001(b).  It does so, *inter alia*, by setting "'various uniform standards [for employee benefit plans], including rules concerning reporting, disclosure, and fiduciary responsibility.'" *Retail Industry Leaders Assoc. v. Fielder*, 475 F.3d 180, 190 (4th Cir. 2007) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 91 (1983)).  Of relevance here, a primary purpose of ERISA is to "ensure the integrity of written, bargained-for benefit plans." *United McGill Corp. v. Stinnett,* 154 F.3d 168, 172 (4th Cir. 1998).

Courts "'must enforce plain and unambiguous statutory language in ERISA,' as in any statute, 'according to its terms.'" *Intel Corp. Investment Policy Committee v. Sulyma*, ___ U.S. ___, 140 S. Ct. 768, 776 (2020) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010)); *see Jenkins v. Montgomery Indus., Inc.*, 77 F.3d 740, 743 (4th Cir. 1996) (stating that general principles of contract law require that federal courts enforce "the plan's plain language in its ordinary sense") (internal quotation marks and citations omitted).  Since its inception in 1974,

---

[15] The summary judgment standard under Fed. R. Civ. P. 56 is well established and need not be recited here.  When, as here, the parties have filed cross-motions for summary judgment, the court must consider "'each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Def. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (citation omitted); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003); *Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied,* 540 U.S. 822 (2003).  Merely because both sides have moved for summary judgment, this does not mean that summary judgment to one party or another is necessarily appropriate.  If there is a genuine issue of material fact, both motions must be denied.  *See* 10A Wright, Miller & Kane, FEDERAL PRACTICE & PROCEDURE § 2720, at 336-37 (4th ed. 2019).

ERISA has defined "employee pension benefit plan" and "pension plan" to refer to any type of plan or program that "provides retirement income to employees" or "results in a deferral of income by employees for periods extending to the termination of covered employment." 29 U.S.C. § 1002(2)(A).

In *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004), the Supreme Court said: "The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. To this end, ERISA includes expansive pre-emption provisions, which are intended to ensure that employee plan benefit regulation would be 'exclusively a federal concern.'" (Citations omitted). *See also New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 646 (1995) (explaining that "[t]he basic thrust of the pre-emption clause was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans"); *Pilot Life Ins. v. Dedeaux*, 481 U.S. 41, 46 (1987) (recognizing "the reservation to Federal authority [of] the sole power to regulate the field of employee benefit plans as ERISA's crowning achievement," and noting that the legislation's sponsors "emphasized both the breadth and importance of the preemption provision" to "establish pension plan regulation as exclusively a federal concern.") (internal quotation marks and citations omitted).

Under ERISA, "[e]very employee benefit plan" must be "established and maintained pursuant to a written instrument," 29 U.S.C. § 1102(a)(1), "specify[ing] the basis on which payments are made to and from the plan." *Id.* § 1102(b)(4). The Plan must be administered "in accordance with the documents and instruments governing the plan insofar as such documents and instruments . . . ." *Id.* § 1104(a)(1)(D). *See Kennedy v. Plan Administrator for DuPont Savings and Investment Plan*, 555 U.S. 285, 300 (2009).

The Supreme Court underscored in *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013): "The plan, in short, is at the center of ERISA. . . [O]nce a plan is established, the administrator's duty is to see that the plan is "maintained pursuant to [that] written instrument. This focus on the written terms of the plan is the linchpin of a 'system that is [not] so complex that administrative costs, or litigation expense, unduly discourage employers from offering [ERISA] plans in the first place' . . . . For that reason, we have recognized the particular importance of enforcing plan terms as written in § 502(a)(1)(B) claims." (Citations omitted; alterations in *Heimeshoff*); *see also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995) (recognizing that ERISA's statutory scheme "is built around reliance on the face of written plan documents"); *Boyd v. Metro. Life Ins. Co.*, 636 F.3d 138, 140 (4th Cir. 2011) (recognizing that "plan administrators must act 'in accordance with the documents and instruments governing the plan . . .'") (citation omitted).

ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), provides that "a plan participant may bring a civil action 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 106 (4th Cir. 2006) (quoting 29 U.S.C. § 1132(a)(1)(B)).

Section 1104 of 29 U.S.C, titled "Fiduciary duties," states, in pertinent part:

(a) Prudent man standard of care

    (1) ... a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

        (A) for the exclusive purpose of:

            (i)     providing benefits to participants and their beneficiaries; and

> (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan. . .

ERISA imposes upon a fiduciary "a duty to provide beneficiaries with accurate information." *Adams v. Brink's Co.*, 261 F. App'x 583, 595 (4th Cir. 2008); *see Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 656 (4th Cir. 1996). To show a breach of fiduciary duty, a plaintiff must prove: "1) that a defendant was a fiduciary of the ERISA plan, 2) that a defendant breached its fiduciary responsibilities under the plan, and 3) that the participant is in need of injunctive or other appropriate equitable relief to remedy the violation or enforce the plan." *Adams*, 261 F. App'x. at 590.

In *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371 (4th Cir. 2001), the Fourth Circuit examined the nature of the duties imposed on plan fiduciaries under ERISA. It explained, *id.* at 380 (some internal citations omitted):

> Congress intended ERISA's fiduciary responsibility provisions to codify the common law of trusts. Under common law trust principles, a fiduciary has an unyielding duty of loyalty to the beneficiary. Naturally, such a duty of loyalty precludes a fiduciary from making material misrepresentations to the beneficiary. However, a fiduciary's responsibility when communicating with the beneficiary encompasses more than merely a duty to refrain from intentionally misleading a beneficiary. ERISA administrators have a fiduciary obligation "not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures." *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 452 (3d Cir. 2000) (internal quotation marks omitted), cert. denied, 531 U.S. 1037 (2000).

Moreover, a fiduciary is at times obligated to affirmatively provide information to the beneficiary. Indeed, "[t]he duty to disclose material information is the core of a fiduciary's responsibility, animating the common law of trusts long before the enactment of ERISA." *Eddy v. Colonial Life Ins. Co. of America*, 919 F.2d 747, 750 (D.C. Cir. 1990). The common law of trusts identifies two instances where a trustee is under a "duty to inform." First, a fiduciary has "a duty to give beneficiaries upon request 'complete and accurate information as to the nature and amount of the trust property.'" *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 656 (4th Cir.1996) (quoting Restatement (Second) of Trusts § 173 (1959)). Second, in limited circumstances, a trustee is required to provide information to the beneficiary even when there has been no specific request:

> "Ordinarily the trustee is not under a duty to the beneficiary to furnish information to him in the absence of a request for such information.... [However,] he is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection...."

Restatement (Second) of Trusts § 173 cmt. d. In sum, the duty to inform "entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence might be harmful." *Bixler* [*v. Cent. Pa. Teamsters Health & Welfare Fund*, 12 F.3d [1292,] 1300 [ (3d Cir.1993)].

"'If the plan [does] not give the employer or administrator discretionary or final authority to construe uncertain terms,'" the court, on judicial review, looks to "'the terms of the plan and other manifestations of the parties' intent.'" *Booth v. Wal-Mart Stores, Inc. Assocs. Health and Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000) (quoting *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 112-13 (1989)) (alteration in *Booth*). This is because ERISA plans are contractual documents. *Id.* at 340. However, "'[w]here discretion is conferred upon the trustee with respect to the exercise of a power,'" the court on review must determine whether there was "'an abuse by the trustee of his discretion.'" *Booth*, 201 F.3d at 341 (quoting *Firestone Tire*, 289 U.S. at 111).

Section 502(a)(3) of ERISA, codified at 29 U.S.C. § 1132(a)(3), serves as a "catchall," offering "appropriate equitable relief for injuries caused by violations that § 502 does not

elsewhere adequately remedy." *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996). It provides, 29 U.S.C. § 1132(a)(3):

> (a) Persons empowered to bring a civil action
>
> A civil action may be brought—
>
> \* \* \*
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

To establish a violation of Section 502(a)(3), a plaintiff must show a violation of an ERISA provision, and that the relief sought constitutes "appropriate equitable relief." *See Pender v. Bank of Am. Corp.*, 788 F.3d 354, 363-64 (4th Cir. 2015). "The Supreme Court has interpreted the term 'appropriate equitable relief,' as used in Section 502(a)(3), to refer to 'those categories of relief that, traditionally speaking (*i.e.*, prior to the merger of law and equity) were *typically* available in equity.'" *Id.* at 364 (emphasis in original) (quoting *CIGNA Corp. v. Amara*, 563 U.S. 421, 439 (2011)) (internal citations omitted). However, relief under Section 502(a)(3) is available only when relief under ERISA's other remedial provisions would otherwise be inadequate. *See Varity Corp.*, 516 U.S. at 512; *Korotynska*, 474 F.3d at 105.

A tax-qualified ERISA plan receives favorable tax treatment. Under Section 404 of the IRC, contributions by employers to tax-qualified plans are tax deductible. *See* 26 U.S.C. § 404. Moreover, participants in qualified plans are not taxed on the value of benefits provided by the plan until those benefits are actually distributed. *See* 26 U.S.C. § 402. And, trusts maintaining qualified plans are also entitled to tax benefits. *See* 26 U.S.C. § 501(a). As a result, trustees of qualified plans have "strong reason (if not obligation) to . . . preserve the tax-exempt status of"

their plans. *Meakin v. California Field Ironworkers Pension Trust*, 5:16-cv-07195, 2018 WL 405009, at *5 (N.D. Ca. Jan. 12, 2018), *aff'd*, 774 F. App'x 1036 (9th Cir. 2019).

ERISA permits pension distributions after age 62, even if an employee has not separated from employment, without jeopardizing the tax-qualified status of the Plan. But, to preserve the tax-qualified status of a Plan, separation from employment is required for distributions before age 62. Section 401(a)(36) of 26 U.S.C. is relevant. It provides that "a trust forming part of a pension plan shall not be treated as failing to constitute a qualified trust under this section solely because the plan provides that a distribution may be made from such trust to an employee who has attained age 62 and who is not separated from employment at the time of such distribution." Thus, in light of 26 U.S.C. § 401(a)(36), to maintain tax-qualified status, payment of retirement benefits is not permissible before age 62 if the employee continues to engage in employment with his or her employer.[16]

The Pension Protection Act of 2006, Public Law No. 109-280, is also noteworthy. It permits ERISA pension plans to make in-service distributions to employees who have not yet separated from employment, so long as the participants have attained at least 62 years of age. Section § 1002(2)(A) of 29 U.S.C. states, in part: "A distribution from a plan, fund, or program shall not be treated as made in a form other than retirement income or as a distribution prior to termination of covered employment solely because such distribution is made to an employee who has attained age 62 and who is not separated from employment at the time of such distribution."

---

[16] As discussed, *infra*, plaintiffs assert: "Tax qualification is [merely] an optional plan design feature, not a mandatory requirement." ECF 45-1 at 29. Therefore, they suggest that tax consequences associated with payment of benefits is not a valid consideration. *Id.* Defendants disagree.

Treasury Regulations promulgated under the IRC are also pertinent. Section 1.401-1(a)(1) of 26 C.F.R. states that section 401(a) "prescribes the requirements which must be met for qualification of a trust [as tax-exempt] forming part of a pension. . .plan." The Treasury Regulation at 26 C.F.R. § 1.401-1(b)(1)(i) states: "A pension plan within the meaning of Section 401(a) is a plan established and maintained by an employer primarily to provide systematically for the payment of definitely determinable benefits to his employees over a period of years, usually for life, after retirement." Further, Section 1.401(a)-1(b)(1)(i) of the Treasury Regulations provides, in part: "A plan does not fail to satisfy this paragraph. . . merely because the plan provides, in accordance with section 401(a)(36), that a distribution may be made from the plan to an employee who has attained age 62 and who is not separated from employment at the time of such distribution." And, Section 1.401(a)-1(b)(2) sets out the rules for determining normal and early retirement ages.

In a Report and Recommendation in *Metzgar v. U.A. Plumbers and Steamfitters Local No. 22 Pension Fund*, 13-cv-JLS-LGF, 2019 WL 1428083, at *12 (W.D. N.Y., Mar. 28, 2019)[17], the magistrate judge laid out other relevant IRS regulations:

> Additionally, 26 C.F.R. § 1.410(a)-7(b)(2) provides that the term "severance from service" is the date "on which the employee quits, retires, is discharged or dies," or "remains absent from service." 26 C.F.R. § 1.410(a)-7(b)(6) provides that an employee's "period of service" is the "period of service commencing on the employee's employment ..." "ending on the severance from service date." 26 C.F.R. 1.409A-1(h)(1)(i) states, in relevant part "an employee separates from service with the employer if the employee ... retires, or otherwise has a termination of employment with the employer." Section 1.409A-1(h)(1)(ii) provides as relevant:
>
> > whether a termination of employment has occurred is determined based on whether the facts and circumstances indicate that the employer and

---

[17] Objections to the Report and Recommendation are pending. Therefore, it has not been adopted by the district court. *See* 13-cv-JLS-LGF, ECF 142, ECF 145, ECF 147. However, the discussion of the relevant regulations is instructive.

employee reasonably anticipated that no further services would be performed after a certain date . . .

Thus, IRS regulations which define requirements for administration of a tax-exempt trust under § 401(a) make clear that a qualified pension trust shall begin pension payments upon an employee's retirement and that such retirement occurs when the employee terminates his or her employment with an employer with the expectation that no further services will be performed by the employee for the employer.

IRS rulings also make clear that a trust established under Section 401(a) of 26 U.S.C. cannot retain its tax-exempt status if it makes pension distributions to employees who have not experienced a separation from service and who have not yet attained the age of 62. In a Private Letter Ruling ("PLR") of April 20, 2010, IRS Priv. Ltr. Rul. 201147038, 2011 WL 5893533 (Nov. 25, 2011), the IRS stated: "[I]f both the employer and employee know at the time of 'retirement' that the employee, with reasonable certainty, continues to perform services for the employer, a termination of employment has not occurred upon 'retirement' and the employee has not legitimately retired." ECF 48-6 at 6. There, the IRS cited to *Meredith v. Allsteel, Inc.*, 11 F.3d 1354 (7th Cir. 1993), in which the Seventh Circuit said, *id.* at 1358: "[I]n common parlance, retire means to leave employment after a period of service." In turn, *Allsteel* cited to Webster's Ninth New Collegiate Dictionary 1007 (1986), which defined "retire" as "to withdraw from one's position or occupation: to conclude one's working or professional career." *See id.*

Thus, the IRS determined that if employees applying for early retirement pension benefits did "not actually separate from service and cease performing services for the employer when they 'retire' these 'retirements' would not constitute a legitimate basis to allow participants to qualify for early retirement benefits." ECF 48-6 at 6. This situation would violate 26 U.S.C. § 401(a), which would "result in disqualification of the Plan under section 401(a) of the Code." *Id.*

In addition, defendants point to IRS Revenue Ruling 71-437 (July 1971) (the "Revenue Ruling"). ECF 48-7. The Revenue Ruling states: "A pension plan does not qualify if it permits distributions of the employer's contributions or increments thereon prior to severance of employment or termination of the plan." *Id.* at 3.

Defendants also submitted IRS Notice 2007-69, 2007 WL 2285348 (August 27, 2007) (the "Notice"). ECF 46-8. The Notice characterizes 26 C.F.R. § 1.401(a)-1(b)(2) as "an exception to the rule that pension benefits be paid only after retirement by permitting a plan. . . to commence payment of retirement benefits to a participant after the participant has attained normal retirement age even if the participant has not yet had a severance from employment with the employer maintaining the plan." ECF 46-8 at 3.

The PLR, the Revenue Ruling, and the Notice constitute agency material that has not gone through notice and comment. The Fourth Circuit explained in *Clive v. Hawke*, 51 F. App'x 392, 396 (4th Cir. 2002): "The Supreme Court held in *Christensen v. Harris County*, 529 U.S. 576 (2000), that agency 'interpretations contained in format such as opinion letters are entitled to respect. . . but only to the extent that those interpretations have the power to persuade.' *Christensen*, 529 U.S. at 587."

### B. Contract Interpretation

A central purpose of ERISA is to "ensure the integrity of written, bargained-for benefit plans." *Stinnett*, 154 F.3d at 172. ERISA plans are contractual documents which, while regulated, are governed by established principles of contract and trust law." *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir. 1996).

In general, entitlement to benefits "turn[s] on the interpretation of the terms in the plan at issue." *Firestone Tire,* 489 U.S. at 115; *see, e.g.*, *Johnson v. American United Life Ins. Co.*, 716

F.3d 813, 819–21 (4th Cir. 2013) (examining language of ERISA insurance policy provision to determine plan participant's eligibility). Notably, "'[c]ourts construe ERISA plans, as they do other contracts, by 'looking to the terms of the plan' as well as to 'other manifestations of the parties' intent.'" *US Airways, Inc. v. McCutchen,* 569 U.S. 88, 102 (2013) (quoting *Firestone Tire*, 489 U.S. at 113). Thus, "the plain language of an ERISA plan must be enforced in accordance with its literal and natural meaning." *Mid Atl. Med. Servs., LLC v. Sereboff*, 407 F.3d 212, 220 (4th Cir. 2005) (internal quotation marks omitted), *aff'd,* 547 U.S. 356 (2006). As the Supreme Court said in *McCutchen,* 569 U.S. at 100, ERISA's "statutory scheme . . . is built around reliance on the face of written plan documents." (Internal quotation marks omitted).

Courts determine the ordinary meaning of terms in a plan "as a reasonable person in the position of the plan participant would have understood the words." *Johnson*, 716 F.3d at 820 (internal citations omitted). Moreover, "ERISA plans, like contracts, are to be construed as a whole." *Id.* Thus, in interpreting a plan, "[c]ontract terms must be construed to give meaning and effect to every part of the contract, rather than leave a portion of the contract meaningless or reduced to mere surplusage." *Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1127 (4th Cir. 1993) (citation omitted). And, "a court should be hesitant to depart from the written terms of a contract . . . in a case involving ERISA, which places great emphasis upon adherence to the written provisions in an employee benefit plan." *Coleman v. Nationwide Life Ins. Co.*, 969 F.2d 54, 56 (4th Cir. 1992).

A plan is ambiguous "'where the language . . . is fairly and reasonably susceptible to either of the constructions asserted by the parties.'" *Johnson*, 716 F.3d at 820 (citation omitted). Notably, it "is ultimately a question of law for the court" as to whether "[a]n ambiguity in fact remains" after application of contract principles. *Id.*

If the terms of a contract are unambiguous, the court interprets the contract as a matter of law. *World–Wide Rights Ltd. P'ship v. Combe Inc.,* 955 F.2d 242, 245 (4th Cir. 1992). In the event of ambiguity, the court seeks to "determine the intent of the parties as reflected in the language" of the Plan." *Johnson*, 716 F.3d at 816. But, if the text remains ambiguous, it must be construed "against the drafter, and in accordance with the reasonable expectations of the insured." *Wheeler v. Dynamic Engineering, Inc.,* 62 F.3d 634, 638 (4th Cir. 1995) (citations omitted). "Congress intended that courts apply contract principles derived from State law but be guided by the policies expressed in ERISA and other federal labor laws." *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997); *accord Tapley v. Locals 302 and 612 of Int'l Union of Operating Engineers — Employers Construction Industry Retirement Plan*, 728 F.3d 1134, 1140 (9th Cir. 2013).

As discussed, ERISA generally preempts state law. "Although courts apply federal common law rules of contract interpretation when construing a policy governed by ERISA, [they] look to 'principles of state common law to guide [their] analysis.'" *Johnson*, 716 F.3d at 819 (internal citations omitted) (quoting *Wheeler*, 62 F.3d at 638); *see Jenkins*, 77 F.3d at 744. Accordingly, the Plan is interpreted with reference to both federal and Maryland contract law principles, which are largely the same. Further, "trust documents must generally be construed in light of ERISA's policies." *Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 568 (1985); *see Bidwell v. Garvey*, 943 F.2d 498, 505 (4th Cir. 1991).

## C. Judicial Review

The parties disagree as to the standard of this Court's review of the Trustees' decision to suspend plaintiffs' Service Pension benefits. Plaintiffs urge de novo review, while defendants seek review based on abuse of discretion.

Defendants maintain that because the Plan documents confer discretion on the Board of Trustees, the appropriate standard of review for this Court is that of abuse of discretion. ECF 46-1 at 17. Conversely, plaintiffs argue that the Plan documents do not confer discretion on the Board of Trustees "to determine a participant's eligibility for benefits." ECF 47-1 at 11. Further, they contend that the Court must conduct de novo review of the Board's decision to suspend benefits because the Board did not adhere to 29 C.F.R. § 2560. 503-1, which "sets forth minimum requirements for employee benefit plan procedures. . . ." *See* ECF 45-1 at 16–19.

Ordinarily, "a denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire*, 489 U.S. at 115; *see Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Woods v. Prudential Ins. Co. of Am.*, 528 F.3d 320, 322 (4th Cir. 2008). When the Plan vests the administrator with discretionary authority to determine eligibility, the administrator's decision is reviewed for abuse of discretion. *Williams v. Metropolitan Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010). If the abuse of discretion standard applies, the court does "not disturb a plan administrator's decision if the decision is reasonable," even if the court would have reached "a contrary conclusion. . . ." *Id.* Of import, a decision of the administrator is reasonable if it results from a "'deliberate, principled reasoning process' and [is] supported by substantial evidence." *Id.* (citation omitted).

If the abuse of discretion standard applies, it "requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008). In other words, the court should not "disturb such a decision if it is reasonable." *Booth*, 201 F.3d at 342. Nor may the court substitute its own judgment for that of the administrator. *Williams*, 609 F.3d at 630.

Plaintiffs contend that the 1975 Trust "is the 'exclusive' source of authority for the Board of Trustees." ECF 47-1 at 11. They argue that the Trust only confers discretion on the Trustees to formulate conditions of eligibility, not to interpret or construe the terms of the Plan. *Id.* This argument is not supported by the relevant instruments.

The Trust (ECF 46-25) delegates discretionary authority to the Board of Trustees. Article III states: "The Purpose of said Pension Fund shall be to provide, *pursuant to a Pension Plan*, pensions and benefits incidental thereto for eligible Employees and their beneficiaries." *Id.* at 14 (emphasis added). This section supports the view that the Trust must be read in conjunction with the Plan.

Section 9.10 of the 2009 Plan states, ECF 46-5 at 95-96:

Except as otherwise specifically provided herein, the Board of Trustees shall have the sole responsibility for and the sole control of the operation and administration of the [P]lan, and shall have the power, discretion and authority to take all action and to make all decisions and interpretations which may be necessary or appropriate in order to administer and operate the Plan, including, without limiting the generality of the foregoing, the power, duty, discretion and responsibility to;

   (a) Resolve and determine all disputes or questions arising under the Plan, including the power and discretion to determine the rights of Employees, Participants and Beneficiaries, and their respective benefits, and to remedy any ambiguities, inconsistencies or omissions.

This section grants the Board of Trustees discretionary authority to "make all decisions and interpretations which may be necessary or appropriate in order to administer and operate the Plan. . . ." *Id.* It is a broad grant of discretion.

The Trust also grants the Trustees authority over "any and all other matters which the Trustees, in their discretion, may deem necessary and proper to effectuate the purposes and intent of the Pension Plan. . . ." ECF 46-25 at 26. Further, the Trust provides in Article VII, Section 4(k) that the Board of Trustees may "[d]o all other acts, and take any and all other action, whether or not expressly authorized herein, which Trustees may deem necessary or proper for the protection of the property held hereunder." *Id.* at 44.

When these provisions are considered together, the Trust delegates discretion to the Board of Trustees beyond a mere grant of administrative powers. *See, e.g.*, *Militello v. Central State, Southeast and Southwest Areas Pension Fund*, 360 F.3d 681, 685-86 (7th Cir. 2004) (granting deference to plan administrator in light of trust and plan documents construed together). Typically, once a court has determined that a plan's governing documents grant discretion to the administrators, the administrators' decisions are reviewed for abuse of discretion.

However, as noted, plaintiffs maintain that the Board of Trustees violated the minimum procedural standards prescribed in 29 C.F.R. § 2560.503-1, and that the violations of § 2560.503-1 trigger de novo review of the Trustees' benefit determinations as to plaintiffs. *See* ECF 45-1 at 17. In particular, plaintiffs allege that the Board of Trustees was required by 29 C.F.R. § 2560.503-1(i)(1)(ii) to render a decision on plaintiffs' appeals "no later than the date of the meeting of the [Board of Trustees] that immediately follows the plan's receipt of a request for review. . . ." *See* ECF 45-1 at 17.

Section 2560.503-1(i)(1)(ii) of 29 C.F.R. states:

In the case of a plan with a committee or board of trustees designated as the appropriate named fiduciary that holds regularly scheduled meetings at least quarterly. . . the appropriate named fiduciary shall instead make a benefit determination no later than the date of the meeting of the committee or board that immediately follows the plan's receipt of a request for review, unless the request for review is filed within 30 days preceding the date of such meeting. In such case, a benefit determination may be made by no later than the date of the second meeting following the plan's receipt of the request for review. If special circumstances (such as the need to hold a hearing, if the plan's procedures provide for a hearing) require a further extension of time for processing, a benefit determination shall be rendered not later than the third meeting of the committee or board following the plan's receipt of the request for review. If such an extension of time for review is required because of special circumstances, the plan administrator shall provide the claimant with written notice of the extension, describing the special circumstances and the date as of which the benefit determination will be made, prior to the commencement of the extension. The plan administrator shall notify the claimant, in accordance with paragraph (j) of this section, of the benefit determination as soon as possible, but not later than 5 days after the benefit determination is made.

And, 29 C.F.R. § 2560.503-1(j)(2) states, in part:

The plan administrator shall provide a claimant with written or electronic notification of a plan's benefit determination on review. . . . In the case of an adverse benefit determination, the notification shall set forth, in a manner calculated to be understood by the claimant. . . [r]eference to the specific plan provisions on which the benefit determination is based. . . .

Plaintiffs maintain that Taylorson filed an appeal on October 30, 2012, within 60 days of the Board of Trustees' suspension letter of September 28, 2012. *See* ECF 45-14. The filing of that appeal is contested. Defendants contend that they have no record of receipt of Taylorson's appeal, and that they first learned of his appeal when he sent a follow-up letter. ECF 46-1 at 31 n.6. But, they do not specify when they received that letter. *See* ECF 46-31. Plaintiffs claim defendants received the appeal, as evidenced by their production of the appeal letter in discovery. ECF 47-1 at 37. In any event, on November 12, 2015, the Fund denied Taylorson's request for reinstatement of his pension benefits. ECF 46-17. Taylorson again appealed, and the Trustees denied his second appeal by letter of February 22, 2016. ECF 46-20.

Chavis appealed his benefit denial on November 19, 2012. ECF 45-15. He was not provided with a decision on his appeal until April 4, 2017. ECF 46-21. Moreover, there is no evidence that the Trustees made "a benefit determination no later than the date of the meeting of the committee or board that immediately follows the plan's receipt of a request for review. . . ." or "the date of the second meeting following the plan's receipt of the request for review." *See* 29 C.F.R. § 2560.503-1(i)(1)(ii).

Plaintiffs also rely on 29 C.F.R. § 2560.503-1(i)(1)(ii), which, as noted, requires the Board of Trustees to inform the claimant of the benefit determination no later than five days after the determination was made. ECF 45-1 at 17. They contend that the Board made its determination as to Taylorson's second appeal at its meeting of January 28, 2016, but did not notify Taylorson of the denial of that appeal until February 22, 2016. *Id.* Further, plaintiffs contend that Chavis's appeal was denied by the Board of Trustees on March 23, 2017. *Id.* However, he was not informed of the decision until April 4, 2017. *Id.* at 18-19.

In addition, plaintiffs complain that there were other regulatory flaws in the Trustees' decision-making process. They contend that the "Board of Trustees did not reference a provision of the *governing* Plan in its appeal denial letter." ECF 45-1 at 18 (emphasis in brief). Thus, they contend that defendants violated 29 C.F.R. § 2560.503-1(j)(2). *See* ECF 45-1 at 17. In this regard, plaintiffs assert that Taylorson's denial letter of February 22, 2016 (ECF 45-19) did "not reference or cite a single Plan provision on which the determination [was] based." ECF 45-1 at 17. Rather, the Board referenced the 2014 Amendments to the 2009 Plan, which did not apply to Taylorson, because he retired in 2009. *Id.* at 18.

The denial letter to Taylorson of February 22, 2016, contains the following language: "Section 7.06 of the Plan Document provides that working in the trade or craft is defined as work

by 'any supervisors below the executive level of a company with 25 or more employees.'" ECF 46-20 at 1. As plaintiffs point out, this language does not appear in the 2009 Plan. Rather, it appears in the amendment to the Plan that went into effect on November 1, 2014. ECF 46-6 at 1. In plaintiffs' view, this language cannot apply to Taylorson, who retired in 2009. *See Central Laborer's Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004) (amendments to plans cannot eliminate or reduce and early retirement benefit "that was earned by service before the amendment was passed[.]").

Similarly, the letter to Taylorson of April 4, 2017, contained text from the 2016 Plan. Again, plaintiffs contend that plan does not apply. ECF 46-22 at 4-6. *Compare* ECF 42-22 at 4-6 *with* ECF 46-8 at 68-70. And, attached to Chavis's denial letter of April 4, 2017, was a copy of Section 7.06 of the 2016 Plan. They assert it did not apply to Chavis, because he retired in 2011.

These procedural defects, in plaintiffs' view, implicate the preamble to 29 C.F.R. § 2560.503-1, which states:

> [I]f a plan fails to provide processes that meet the regulatory minimum standards, the claimant is deemed to have exhausted the available administrative remedies and is free to pursue the remedies available under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim. The department's intentions in including this provision in the proposal were to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference.

Defendants dispute that Taylorson timely appealed. They contend that the first indication they had of his appeal was an undated letter requesting an update as to his appeal. ECF 46-1 at 31, n.6; ECF 46-31. They do not indicate when they received this letter.

As I see it, whether Taylorson filed his appeal in October 2012, as he claims, is a factual dispute that I cannot resolve on summary judgment. But, the other procedural flaws speak for themselves.

The issue of what standard of review is appropriate in the case of procedural irregularities in the ERISA claims review process is the subject of a split among circuits. The circuits are divided on whether de novo review or abuse of discretion applies if there is substantial compliance with the regulatory deadlines under 29 C.F.R. § 2560.503-1. Under the substantial compliance doctrine, if an administrator "'substantially complies' with the prescribed procedures – in other words, if the violation is relatively minor, then the court will still defer to the administrator's decision" if the plan otherwise conferred "the discretion to administer it." *Fessenden v. Reliance Standard Life Ins. Co.*, 927 F.3d 998, 999-1000 (7th Cir. 2019). Thus, under the doctrine, "a plan administrator who has violated a technical rule under ERISA . . . may be excused for the violation if the administrator has been substantially compliant with the requirements of ERISA." *Edwards v. Briggs & Stratton Retirement Plan*, 639 F.3d 355, 361-62 (7th Cir. 2011). It is a "judge-made" doctrine. *Fessenden*, 927 F.3d at 1002.

The Second and Seventh circuits have rejected the substantial compliance doctrine as to benefit determination and appeal deadlines, applying de novo review in the event of procedural violations. In contrast, the Third, Ninth, and Tenth circuits apply the substantial compliance doctrine to such procedural irregularities, thereby reviewing for abuse of discretion, if the violations are relatively minor. *See Becknell v. Severance Pay Plan of Johnson & Johnson and U.S. Affiliated Companies*, 644 F. App'x 205, 213 (3d Cir. 2016) (suggesting de novo review only appropriate in the case of "severe procedural violations"); *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 634 (10th Cir. 2003) ("We agree that a 'substantial compliance' approach is appropriate

in this case."); *Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan,* 349 F.3d 1098, 1100 (9th Cir. 2003) ("Absent unusual circumstances, an administrator engaged in a genuine, productive, ongoing dialogue that substantially complies with a plan's and the regulations' timelines should remain entitled to whatever discretion the plan documentation gives it.").

In support of plaintiffs' position, they cite *Halo v. Yale Health Plan*, 819 F.3d 42 (2d Cir. 2016). In *Halo*, 819 F.3d at 49, the Second Circuit evaluated the claims procedure in 29 C.F.R. § 2560.503-1 in light of an amendment to the regulation issued in 2000 and effective in 2002. *See* 29 C.F.R. § 2560.503-1(1) (the "2002 Amendment"); *see also Fessenden*, 927 F.3d at 1002. The 2002 Amendment provides, 29 C.F.R. § 2560.503-1:

> In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

This provision does not explicitly address the standard of review in federal court.

The *Halo* Court rejected the "substantial compliance" doctrine as applied to the procedural requirements in 29 C.F.R. § 2560.503-1 and determined that, in light of principles of trust law, the regulatory and statutory purpose of ERISA, as well as the claims procedure regulations, the ambiguity of the regulation with respect to the standard of review to be applied in the event of procedural violations, and the interpretation of the Department of Labor ("DoL"), the preamble should be granted deference and a de novo standard of review should apply, except where the deviations from the procedure are "inadvertent and harmless." *Halo*, 819 F.3d at 57.

In particular, the *Halo* Court noted that during the notice and comment period, the DoL had received numerous comments from employers and plans arguing that a provision rejecting

substantial compliance with the minimum procedural requirements "would impose unnecessarily

harsh consequences on plans" and that the DoL should instead adopt a "good faith compliance"

standard.  *Id.* at 50.  The DoL rejected those arguments.  *Id.*  The *Halo* Court determined that

DoL's intention, as evidenced by the regulation's preamble, was to provide procedural minima

that it considered essential to fairness.  *Id.*  And, because the regulation itself, silent on the standard

of review for cases where the procedural minima have not been met, is "at least ambiguous with

respect to the standard of review," the *Halo* Court concluded that, under *Auer v. Robbins*, 519 U.S.

452 (1997), the preamble is entitled to deference as an agency interpretation.[18]  *Halo*, 819 F.3d at

54.

Defendants counter that *Halo* is not binding on this Court.  ECF 46-1 at 28.  They observe

that many other courts follow the substantial compliance doctrine, with a result that procedural

irregularity does not defeat a deferential abuse of discretion standard.  *Id.* at 28-29.  Under the

---

[18] Regulations promulgated pursuant to notice and comment are analyzed in accordance with the principles set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See, e.g.*, *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165–75 (2007); *Christensen*, 529 U.S. at 586-88; *Auer*, 519 U.S. at 457–58.  Agency interpretations of regulations, such as contained in preambles, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see Christensen*, 529 U.S. at 587; *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, n. 2 (4th Cir. 2011); *Monahan v. County of Chesterfield, Va.*, 95 F.3d 1263, 1272 n. 10 (4th Cir. 1996).

The Supreme Court recently addressed *Auer* deference.  *Kisor v. Wilkie*, __U.S. __, 139 S. Ct. 2400 (2019).  *Auer* deference can only be applied when the regulation is "genuinely ambiguous."  *Id.* at 2415.  Before "concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction."  *Id.* (citation omitted).  If the regulation is genuinely ambiguous, the "agency's reading must still be reasonable."  *Id.* at 2416.  Further, to be entitled to *Auer* deference, a reasonable agency interpretation must be the agency's "'authoritative'" or "'official'" position.  *Id.* (citation omitted) The interpretation must "in some way implicate [the agency's] substantive expertise."  *Id.* at 2417.  And, the interpretation must reflect a "'fair and considered judgment.'"  *Id.* (citation omitted).

substantial compliance doctrine, plan administrators who have violated procedural requirements may avoid de novo review if their actions "substantially complied" with the regulation. *See, e.g.*, *Jebian*, 349 F.3d at 1108.

A 2019 decision by the Seventh Circuit, *Fessenden*, 927 F.3d 998, is instructive. The *Fessenden* Court noted that the preamble to 29 C.F.R. § 2560.503-1 does not resolve whether plans need only substantially comply to be accorded deferential review. *Id.* at 1003. It pointed out that the Seventh Circuit has applied the substantial compliance doctrine since the 2002 regulations became effective. *Id.* But, the *Fessenden* Court expressly said that the "'substantial compliance' exception does not apply to blown deadlines." *Id.* at 1000. It reasoned that "a deadline is a bright line," creating "a hard-and-fast obligation," and therefore a tardy decision denying benefits "is not entitled to deference." *Id.* And, because the claims regulation provides for an extension period in "special circumstances," but provides that the extension shall in no event exceed the allotted period, these deadlines must be strictly observed. *Id.* at 1004. It added that "even if the substantial compliance doctrine remains valid, it does not apply to the violation of regulatory deadlines." *Id.* at 1003. Nevertheless, the court recognized that it need not decide whether substantial compliance applied, because it could decide the case "on a narrower ground." *Id.*

Defendants rely on two other cases in support of their contention that they are entitled to review under an abuse of discretion standard: *Seger v. ReliaStar Life*, 3:04-cv-16, 2005 WL 2249905 (N.D. Fl. Sept. 14, 2005), and *Lundsten v. Creative Cmty. Living Servs*, 13-C-108, 2014 WL 2440716 (E.D. Wis. May 30, 2014). In both cases, district courts excused delays in appeal determinations beyond the time period prescribed in § 2560.503-1.

In *Seger*, the review exceeded the time by 90 days. 2005 WL 2249905, at *11. The court there found that the plan administrator "was engaged in a good faith attempt to comply with the

deadlines, and . . . attempted to reasonably keep [the plaintiff] informed regarding the delay in processing her claim" while it sought an independent medical review. *Id.* Because the plan administrator had repeatedly sought the independent review while advising the plaintiff of the reason for the delay, the plaintiff was not entitled to de novo review. *Id.* at *12. *Lundsten* involved a delay of 182 days. 2014 WL 2440716, at *3. But, the court found that there was an "on-going, good faith exchange of information, and the resulting delay was completely inconsequential." *Id.* at *5.

To my knowledge, the Fourth Circuit has not yet squarely addressed the issue of the standard of review in light of the 2002 Amendment to 29 C.F.R. § 2560.503-1. Prior to the amendment, the Fourth Circuit had stated: "Not all procedural defects will invalidate a plan administrator's decisions if there is 'substantial compliance' with the regulation." *Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir. 1997). And, district courts in this circuit seem to apply the substantial compliance doctrine with respect to procedural deviations from the requirements in 29 C.F.R. § 2560.503-1. One court observed that a "court 'may infer that the trustee did not exercise judgment when rendering [its] decision' in only a limited number of circumstances, including 'where procedural irregularities are so egregious that the court has a total lack of faith in the integrity of the decision making process.'" *Price v. UNUM Life Ins. Co. of Am.*, GJH-16-2037, 2018 WL 1352965, at *8 (D. Md. Mar. 14, 2018) (quoting *Arnold ex rel. Hill v. Hartford Life Ins. Co.*, 527 F. Supp. 2d 495, 503 (W. D. Va. 2007)) (cleaned up). In *Arnold*, 527 F. Supp. 2d at 502-03, the court noted that "amended section 2560.503-1 'simply does not speak to the issue of the standard of review.' . . . there was no ambiguity in the regulation and 'nothing in the text of the rule itself purports to prescribe a standard of judicial review.'" (quoting *Goldman v. Hartford Life & Accident Ins. Co.*, 417 F. Supp. 2d 788, 803-04 (E.D. La. 2006)).

In *Hardt v. Reliance Standard Life Ins. Co.*, 494 F. Supp. 2d 391 (E.D. Va. 2007), the court considered the effect of the 2002 Amendment to § 2560.503-1, finding that the amended regulation did not answer the question of whether courts are required "to review claim determinations made after the regulatory deadline de novo or for abuse of discretion." *Id.* at 394. The court ultimately applied a modified abuse of discretion standard, because the parties were in contact during the pendency of the appeal and the plan was "taking action" on the appeal and "taking steps commensurate with the exercise of its discretion as delineated in the Plan. . . ." *Id.*

As noted, on June 11, 2009, Taylorson signed his application for his pension. ECF 46-9. Chavis signed the application for his pension on October 6, 2011. ECF 46-10. Their benefits were suspended on September 28, 2012. ECF 45-12; ECF 45-13.

It is undisputed that Chavis filed a timely appeal on November 19, 2012. ECF 45-15. Yet, the Trustees did not notify him of a decision as to his appeal until more than four years later, on April 4, 2017. ECF 46-21.

According to 29 C.F.R. § 2560.503-1(i)(1)(ii), the Board of Trustees was required to consider the appeals at the meeting of the Board of Trustees "that immediately follows the plan's receipt or a request for review, unless the request for review is filed within 30 days preceding the date of such meeting." The record does not contain minutes for the meeting of November 29, 2012 meeting. *See* ECF 46-14 at 2. And, the minutes for the meeting on December 27, 2012, do not reflect a discussion of the appeal of Taylorson or Chavis. ECF 46-14. But, the minutes from meetings between December 27, 2012 and October 23, 2014, reflect a back-and-forth with Johnson & Krol, the law firm hired by the Trustees to assist with the legal determination of entitlement to Service Pension benefits. ECF 46-15; ECF 46-16. Moreover, J&K sent a Memorandum to the

Trustees on July 2, 2013 (ECF 46-15), in which plaintiffs' Service Pension benefits were discussed.

There is no evidence in the record that the Trustees informed Taylorson or Chavis of their need for an extension to resolve the matter. *See* 29 C.F.R. § 2560.503-1(i)(1)(i). Moreover, there is no evidence in the record that defendants advised plaintiffs that the delay in rendering their decision on appeal was caused by their ongoing efforts to address the matters. And, the Trustees attached Plan language to plaintiffs' denial letters that did not apply to them.

At the very least, de novo review is appropriate as to Chavis, because the violation of the deadline set out in 29 C.F.R. § 2560.503-1 was substantial, if not egregious. Moreover, the fact that plaintiffs' benefit eligibility turns on a question of law, *i.e.*, whether the Trustees correctly determined that plaintiffs were not entitled to Service Pension benefits while employed with Johnson Controls, counsels in favor of de novo review. *See Gauer v Connors*, 953 F.2d 97, 99-100 (4th Cir. 1991) ("The applicability of ERISA and its regulations is a question of law. 'When an eligibility determination by plan administrators turns on a question of law, courts have not hesitated to apply a *de novo* standard of review.'") (quoting *Weil v. Retirement Plan Admin. Comm.*, 913 F.2d 1045, 1049 (2d. Cir. 1990)).

I shall apply de novo review. But, the issue as to standard of review is largely academic. This is because, even under a de novo analysis, defendants correctly found that plaintiffs were not entitled to their Service Pension benefits.[19]

---

[19] For this reason, I need not address defendants' alternative argument that, in the event the Court determines to apply de novo review, the Court should remand the case for further consideration. *See* ECF 46-1 at 31-32. In any event, defendants acknowledge that a remand would merely result in unnecessary delay. They assert: "To remand the claim to the plan administrator would only result in a further delay with the same end result – a denial of Plaintiffs' benefits." *Id.* at 32.

## III. Discussion

### A. Retirement and Finality

Plaintiffs argue that they are "retired under the law," ECF 45-1 at 30, and observe that "literally millions of retirees work in some capacity while retired and receiving pension benefits[.]" *Id.* at 31. They insist that "there is not authority for the proposition that such work, or the pension payments those retirees receive, are unlawful." *Id.*

This argument is unavailing. The issue is not about the many retirees who work after retirement. Rather, the issue is whether plaintiffs were entitled to Service Pension benefits under the Plan. Plaintiffs' benefits were suspended not because they were working, but because they were under age 62 and had not separated from employment with Johnson Controls.

Plaintiffs also assert that the Trustees' initial decisions to approve the retirements of Taylorson and Chavis are, by the terms of the Plan, "final and binding on all parties." ECF 45-1 at 25 (quoting ECF 45-7 at 67, section 7.03 of the 2009 Plan). Further, they argue: "The Plan is devoid of any provision that permits the Board of Trustees to reconsider or reverse a prior decision made by the Board of Trustees." ECF 45-1 at 25. They also point to 29 U.S.C. § 1104(a)(1)(D), which requires the Board of Trustees to administer the Plan in accordance with its terms. *Id.* at 25-26. Therefore, plaintiffs maintain that the Board is bound by its initial approval of their Service Pension benefits. *Id.* at 26. This argument is also without merit.

For one thing, plaintiffs quote selectively from Section 7.03. They omit the following text: "The Trustees shall be, subject to the requirements of the law, the sole judges of . . . the application and interpretation of this Plan, and decisions of the Trustees shall be final and binding on all parties. . . ." ECF 45-7 at 67. The provision obligates the Trustees to comply with the law. Nor does it preclude the Trustees from reconsidering their decisions.

Section 9.10 of the 2009 Plan is also relevant. Titled "Administrative Authority," it confers on the Board of Trustees "the power and discretion to determine the rights of . . . Participants . . . and their respective benefits . . . ." ECF 45-7 at 95-96. Further, it confers authority "to remedy any ambiguities, inconsistencies, or omissions." *Id.* at 96.

Here, the Board was reviewing prior benefit determinations for compliance with the law. To that end, it sought the opinion of a law firm, Johnson & Krol, in order to determine whether to continue to pay the Service Pensions of multiple Plan participants who were working subsequent to retirement. ECF 46-15. The law firm explicitly said: "It should also be pointed out that eligibility for a distribution is also dependent on the participant having a severance from employment (also known as a separation) as required under the [Internal Revenue] Code. Accordingly, a participant who leaves covered employment, but continues to work for the same employer in another capacity has not had a severance from employment and thus, is not eligible for a pension." *Id.* at 2-3.

The Board determined that certain pension payments jeopardized its tax-qualified status. The 2014 Amendments to the Plan do not apply. They are merely relevant to show that the Trustees sought to clarify that non-Union supervisory work for certain companies involved in the mechanical contracting and servicing industry constituted unauthorized employment under the Plan. ECF 46-6 at 2-3. "[A]s fiduciaries within the meaning of § 3(21)(A) of ERISA, the Trustees had a duty to ensure that the Plan complied with relevant law." *Meakin*, 2018 WL 405009, at *5.

Moreover, the Board of Trustees "is [not] precluded from reconsidering an award of benefits to correct its own error, so long as the plan administrator specifically justifies the change as the correction of an earlier mistake and the record supports that decision." *Serbanic v. Harleysville Life Ins. Co.*, 325 F. App'x. 86, 91 (3d Cir. 2009). "When administrators are granted

discretion in interpreting plan provisions, their first interpretation is not set in amber, nor do they lose their discretion after misconstruing the provision once." *Meakin v. California Field Ironworkers Pension Trust*, 774 F. App'x 1036, 1038-39 (9th Cir. 2019) (citing *Conkright v. Frommert*, 559 U.S. 506 (2010)); *see also Reynolds v. Bethlehem Steel Corp.*, 619 F. Supp. 919, 924-25 (D. Md. 1984) (failure to correct an error would have been a breach of the fiduciary duty to administer the plan according to its terms).

## 2. Plan Interpretation

Plaintiffs claim they were entitled to Service Pension benefits based on the text of the 2009 Plan, and that the Board impermissibly looked beyond the Plan to the IRC in making its decisions. ECF 45-1 at 19–25.

Taylorson retired in 2009. Chavis retired in 2011. As discussed earlier, the 2016 Plan states that "the rights, benefits and interests of any employee who died, retired or otherwise terminated his or her employment with a Participating Employer prior to January 1, 2016 shall be determined under the provisions of the Plan as in effect on the date such former employee died, retired or otherwise terminated his or her employment with the Participating Employer." ECF 46-8 at 7-8. Therefore, the 2009 Plan applies here. As a result, the 2014 Amendments to Section 7.06 do not apply.

The analysis of the 2009 Plan cannot take place in a vacuum. It has many provisions, and many of them are interrelated.

The parties focus on the definition of "Hour of Service" in the 2009 Plan. As noted, Section 7.06 of the 2009 Plan states that a Pensioner engages in "Unauthorized Employment" if, during a given month, he or she "completes 40 or more Hours of Service in: (1) an industry in which Employees covered by the Plan were employed and accrued benefits under the Plan as a result of

such employment at the time that he or she reached Normal Retirement Age or retired, if earlier; (2) a trade or craft in which the Participant or Pensioner was employed at any time under the Plan; and (3) the geographic region covered by the Plan at the time he or she reached Normal Retirement Age or retired, if earlier." ECF 46-5 at 60-61.

As stated previously, Section 1.15(a) of the Plan defines "Hour of Service" as "[e]ach hour for which an Employee is paid, or entitled to payment for the performance of duties in Covered Employment for the Employer during the applicable computation period." *Id.* at 12. Section 1.10 of the 2009 Plan defines "Covered Employment" as "employment of an Employee by an Employer for which the Employer is obligated by its Collective Bargaining Agreement, or other written agreement, to contribute to the Fund." ECF 46-5 at 11. Section 1.15(e)(1) states that "Hours of Service under subsections (a), (c) and (d) above shall be determined by Fund records. Hours of Service under subsection (b) above shall be determined in accordance with Department of Labor Regulations Section 2530.200b-2(b)." *Id.* at 14.[20]

The parties dispute the construction of Section 1.15(a). Plaintiffs argue, based on the Plan text, that the only employment that can be considered "Unauthorized Employment" under the Plan is employment that results in Hours of Service. ECF 45-1 at 26-27. And, an employee accrues Hours of Service only if engaged in "Covered Employment," *i.e.*, each hour for which an employee is paid and each hour for which an employee is entitled to payment, in accordance with a collective bargaining agreement. ECF 46-5 at 11. Thus, plaintiffs contend that non-Union work can never result in Hours of Service. ECF 47-1 at 24. In this regard, they point to their lack of accrual of

---

[20] Section 1.15(b) defines an Hour of Service in situations where "no duties are performed" by an employee, due to "vacation, holiday, illness, incapacity . . ., layoff, jury duty, military duty or leave of absence," but the employee is nonetheless paid or entitled to payment. *Id.* Section 1.15(e)(2) states that "Hours of Service . . . shall be credited to the appropriate computation period in accordance with the Department of Labor Regulations Section 2530.200(b)-2(c)." *Id.*

any Hours of Service in their management positions at Johnson Controls, as reflected in the Fund Records. ECF 45-1 at 28. In their view, the absence of any Hours of Service in the Fund records establishes that they were not engaged in Unauthorized Employment. *Id.* at 27.

In contrast, defendants urge a reading of Section 1.15(a) that emphasizes its disjunctive nature, stating: "Each hour for which an Employee is paid, **or** entitled to payment for performance of duties in Covered Employment for the Employer during the applicable computation period." ECF 46-1 at 19 (emphasis in brief). In defendants' view, an Hour of Service is created either when an employee is paid for employment or, alternatively, when an employee is entitled to payment for the performance of duties in a covered position.

According to defendants, under this construction, non-Covered Employment that otherwise meets the factors laid out in Section 7.06 (1), (2), and (3) would qualify as Unauthorized Employment, giving full effect to the terms of the Plan. To construe Section 7.06 otherwise, they argue, would render it "utterly meaningless and unenforceable . . . ." *Id.* at 38.

Plaintiffs insist that defendants' construction is flawed. They point to Section 2530.200(b)-2(f) of 29 C.F.R., which provides: "A plan which credits service on the basis of hours of service must state in the plan document the definition of hours of service set forth in paragraph (a) of this section. . . ." Therefore, plaintiffs contend that the Plan's definition of Hours of Service must appear in the Plan. ECF 47-1 at 24.

Moreover, plaintiffs note that "[t]he Plan's definition of 'Hour of Service' is derived from" the DoL's model definition of Hours of Service at 29 C.F.R. § 2530.200(b)-2(a)(1). *Id.* at 24. It states: "An hour of service is each hour for which an employee is paid, or entitled to payment, for

the performance of duties for the employer during the applicable computation period."[21]  In their view, the definition in the Plan "complies with this requirement, as modified for the Plan's status as a collectively bargained plan."  *Id.*  Because the DoL model definition provides that each hour an employee is paid and each hour for which an employee is entitled to payment both count towards hours of service, plaintiffs posit that the Plan's definition of Hours of Service must be construed the same way.

Notably, the Plan's version of Hours of Service is not entirely consistent with the DoL regulation.  Section 1.15(a) adds a reference to Covered Employment.  It also omits the comma after the word "payment."  ECF 46-5 at 12.  The absence of the comma arguably renders ambiguous the Plan's definition of Hours of Service.  A reasonable person could read the definition of Hours of Service to apply the term "Covered Employment" to both hours for which an employee is paid and hours for which an employee is entitled to payment, as plaintiffs do.  But, it might also be construed to apply the term "Covered Employment" only to hours for which an employee is entitled to payment.  *Cf. U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 44 (1993) ("Statutory construction 'is a holistic endeavor,'. . . and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.") (internal citation omitted); *see also Lopez-Soto v. Hawayek*, 175 F.3d 170, 174 (1st Cir. 1999) (noting that "punctuation can provide valuable insights into statutory interpretation"); *see World Properties, Inc. v. Arlon, Inc.*, 663 F. Supp. 2d 98, 107 (D. Conn. 2009) (recognizing that grammatical principles of statutory construction also apply to the construction of contracts).

---

[21] Defendants urge that the definition of "Hour of Service" in Section 1.15(a) must be read in conjunction with 29 C.F.R. § 2530.200b-2(b).  Based on the plain text of the 2009 Plan, it appears that the DoL regulations found in § 2530.200b-2(b) apply only to the definition of Hour of Service under Section 1.15(b), not Section 1.15(a).  Pursuant to Section 1.15(e)(1), Hour of Service under Section 1.15(a) "shall" be determined by Fund records.

Arguably, neither reading of Hours of Service gives effect to the Plan as a whole, or to the intention of the Plan to comply with the IRS. And, a court should read an ERISA plan to give effect to every provision. *World–Wide Rights Ltd. P'ship,* 955 F.2d at 245.[22]

Under plaintiffs' construction, the 2009 Plan defines Unauthorized Employment in terms of Hours of Service, which in turn is defined in terms of Covered Employment. Such a reading of the Plan forces the conclusion that the only employment that could result in Hours of Service, and thus be unauthorized under Section 7.06, is Covered Employment, *i.e.*, a Union position.

This construction would partially dispense with the criteria in Section 7.06. No non-Union employment in the trade or craft within the geographic region of the Fund could ever be deemed unauthorized, because it could never generate an Hour of Service. If non-Covered Employment cannot be Unauthorized Employment, because it does not result in any Hours of Service, a non-Union job could never be assessed for the factors in Section 7.06(1), (2), and (3), and a Plan participant could not be disqualified from taking a non-Union job in the same geographical area as the Plan.

In other words, the only work proscribed by Section 7.06 as Unauthorized Employment is Covered Employment, *i.e.*, Union jobs in the industry in which employees covered by the Plan were employed, in the trade or craft in which the participant was employed while working under the Plan, and in the same geographic area as the Plan. Such a reading renders the geographical and industry terms at least partially superfluous, in that they would not apply to non-Union

----

[22] The 2014 Amendments and the 2016 Plan amended Section 7.06 to include Section 7.06(c). It explicitly notes that unauthorized employment prior to age 62 includes "work for any mechanical contractors, union or non-union…." ECF 46-6 at 3; ECF 46-8 at 70. This amendment suggests that the Trustees recognized the ambiguity in the Plan and were attempting to correct it.

positions. Moreover, plaintiffs' position would enable Union employees to undercut the Union by accepting lower wage non-Union positions, using Union benefits to supplement their wages.

Plaintiffs would also read out of the 2009 Plan the directive in the preamble of the Plan to maintain the tax-qualified status of the Plan. Under plaintiffs' reading, because they accrued no Hours of Service pursuant to the plain text of Section 1.15(a), they are entitled to a Service Pension, without regard to any adverse tax consequences to the Plan. *See* ECF 45-1 at 28-29. In their view, if the directive in the Plan's preamble conflicts with the plain text of another provision of the Plan, the Trustees were obliged to ignore the preamble. They reason that "[t]ax qualification is an optional plan design feature, not a mandatory requirement." *Id.* at 29. Further, they assert: "Tax disqualification is not an excuse for refusing to pay the benefits promised under the terms of the Plan—there is no statutory authority permitting the Board of Trustees to deny benefit claims simply to avoid jeopardizing the tax qualified status of the Plan." *Id.*

In defendants' view, tax qualification is not an optional feature of the plan. They contend that it is central to the Plan, and the Trustees "were under a legal and fiduciary duty to stop Plaintiffs' pension payments to maintain the tax-exempt status." ECF 48 at 24. According to defendants, the Trustees "were obligated to prohibit pension payments to any participants who had not had a severance of employment. . . ." *Id.*

In addition to citing the Plan's preamble, defendants point to Section 7.12 of the Plan. Section 7.12 provides that "benefits under the Plan shall be limited in accordance with section 415 of the [Internal Revenue] Code and the Treasury Regulations thereunder, in accordance with this Section. This section is intended to incorporate the requirements of section 415 of the Code by reference except as otherwise specified herein." ECF 46-5 at 67. As defendants put it, Section 7.12 establishes that the Plan was intended "to comply with ERISA and the Internal Revenue Code

and all regulations thereunder." ECF 46-1 at 22. According to defendants, "within the meaning of § 3(21)(A) of ERISA, the Trustees had a <u>duty</u> to ensure that the Plan complied with relevant law." ECF 46-1 at 22 (emphasis in brief).

As mentioned, Section 7.12 refers to Section 415 of 26 U.S.C. It is titled "Limitations on benefits and contributions under qualified plans." The provision details the conditions that defined benefit and contribution plans must meet in order to remain tax qualified. Although Section 415 does not contain any provisions that are directly relevant here, its inclusion in the Plan makes clear that it was the intent of the Plan generally to remain tax qualified by complying with the IRC.

Defendants' reading gives effect to the Plan's preamble, to Section 7.12, and also to Article IV of the Trust, discussed earlier. It states: "It is the intention of the Trustees to be in full and strict compliance with all requirements of the [IRC]." And, Section 7.12 of the Plan could not be more clear. It unequivocally states, in part: "[N]otwithstanding any other provisions of the Plan . . . benefits under the Plan shall be limited in accordance with Section 415 of the [IRC] and the Treasury Regulations thereunder. . . . This Section 7.12 is intended to incorporate the requirements of Section 415 of the Code by reference. . . ."

Defendants' reading of Section 1.15(a) also gives full effect to Section 7.06. It permits both Covered and non-Covered employment to qualify as Unauthorized Employment if the position otherwise meets the factors laid out in Section 7.06.

On the other hand, defendants' construction seems at odds with Section 1.15(e) of the Plan. As noted, Section 1.15(e)(1) states: "Hours of Service. . . shall be determined by Fund records. . . ." If Hours of Service are generated when a Plan participant is paid, any post-retirement employment of a Plan participant, not just covered employment, should be tracked by the Fund records. And, because benefits are calculated in part based on Hours of Service (*see, e.g.*, Section 4.01(b) of the

Plan), those hours would count towards accrued benefits for non-Union employment. Yet, that does not appear to have been intended under the Plan.

Neither proposed reading of Section 1.15(a) gives full effect to the entire Plan in a coherent way. Plaintiffs' proposed reading nullifies the preamble's directive to remain tax-qualified. It also renders Section 7.06 inapplicable to post-retirement, non-Union employment. And, defendants' reading creates tension with Section 1.15(e), because there are no Fund records or accrued benefits generated for non-Union employment.

A court must "first look to explicit language of the agreement to determine, if possible, the clear intent of the parties." *Meakin*, 2018 WL 405009, at \*5. It is clear that the intent of the Plan is to abide by the law, including the IRC. It is equally clear that the Plan had the goal of remaining tax-qualified. The ambiguity in Section 1.15(a) must be construed in light of the Plan's express intention. Indeed, "[t]he intended meaning of even the most explicit language can, of course, only be understood in light of the context that gave rise to its inclusion." *Id.*

Therefore, the Trustees were entitled to construe the Plan in light of the IRC, and to consider the IRC in resolving any ambiguity in the Plan.

### 3. Looking Beyond the Plan Text

According to plaintiffs, in making the decision to suspend plaintiffs' benefits and to deny their appeals, the Board of Trustees "impermissibly looked beyond the four corners of the Plan document. . . ." ECF 45-1 at 22. They insist that "ERISA plan fiduciaries may not look beyond the terms of the ERISA plan when making benefit determinations." *Id.* The 2009 Plan, in plaintiffs' view, "is replete with references to the Code, Treasury Regulations and IRS Notices. Thus, the Board of Trustees knows how to incorporate these authorities into the Plan and, where the Board of Trustees wanted to incorporate these authorities, they did." *Id.* at 21-22. They assert

that "nowhere in the Plan is there any section of the Code that requires Plan participants to completely sever all employment in order to retire under the Plan—as no such section of the Code exists." *Id.* at 22. In support of this argument, plaintiffs rely on *Kennedy*, 555 U.S. 285, and *Boyd*, 636 F.3d 138.

Defendants argue that "ERISA fiduciaries must administer a plan pursuant to the plan document, but only to the extent that it is consistent with Subchapters I and III of ERISA. . . . '[T]rust documents cannot excuse trustees from their duties under ERISA, and that trust document must generally be construed in light of ERISA's policies.'" ECF 46-1 at 21 (citing *Central States*, 472 U.S. at 568). Further, defendants posit that the Trustees were required to "look outside the isolated language of the Plan and endeavor to 'understand [it] in light of the context that gave rise to its inclusion.'" *Id.* at 22 (quoting *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007)). Because Section 7.12 of the Plan makes explicit the intention to comply with the Internal Revenue Code, the Trustees insist that they were obligated to interpret the Plan, "consistent with relevant law." *Id.* at 22.

*Kennedy* and *Boyd* are inapposite. In *Kennedy*, a plan participant designated his wife as beneficiary on his savings and investment plan. 555 U.S. 285 at 288-89. The two subsequently divorced, subject to a decree that divested the wife of rights to the benefit plan. *Id.* at 289. The participant predeceased his former wife, without having removed her as his beneficiary under the plan. *Id.* When the participant died, the plan relied on the designation it had on file and paid the benefits to the ex-wife. *Id.* at 289-90. The decedent's estate sued the plan, claiming the benefits should have been paid to the estate. *Id.* at 290. The Supreme Court held that that plan administrator "did its statutory ERISA duty by paying the benefits to [the wife] in conformity with the plan documents." *Id.* at 300. To hold otherwise, reasoned the Court, would require plan administrators

"to examine a multitude of external documents that might purport to affect the dispensation of benefits." *Id.* at 301 (internal quotation omitted).

*Boyd* turns on similar facts. Boyd could "unilaterally change the designated beneficiary [of her life insurance policy] at any time by sending a signed and dated written request to MetLife." 636 F.3d at 139. Boyd named her husband as beneficiary, and they subsequently separated. *Id.* When she died, the plan documents still listed him as the beneficiary, "even though he had previously signed a separation agreement in family court waiving any claim to the benefits." *Id.* MetLife sent the benefits to the husband. The decedent's mother and son, the personal representative of her estate, filed suit. *Id.* The Fourth Circuit applied *Kennedy*, stating that its application "reliev[ed] plan administrators of the need to divine obscure participant intentions and of the specter of a lengthy fight in court[.]" *Id.* at 143-44.

These cases involved the consideration of external legal proceedings and "participant intentions," not the consideration of laws and regulations applicable to ERISA plans. As such, they do not represent a blanket prohibition on consulting anything external to the plan text, as plaintiffs read them to say. There is nothing in *Kennedy* or *Boyd* that prohibits the Trustees in this case from looking to applicable federal law, where, as here, there is ambiguity.

The Trustees are required under the 2009 Plan to administer the Plan "in order that the Plan may qualify as a tax-qualified multi-employer defined benefit pension plan and conditioned on such qualification." ECF 46-5 at 7. Further, under ERISA, pension funds are to be administered under "the common law of trusts to define the general scope of their authority and responsibility." *Central States,* 472 U.S. at 570. ERISA requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of providing benefits to participants. . . ." 29 U.S.C. § 1104(a)(1)(A). A trustee must

"administer the trust, diligently and in good faith, in accordance with the terms of the trust and applicable law." Restatement (Third) Trusts § 76(A) (2007).

The 2009 Plan explicitly required administration of the Plan in such a way as to maintain its tax-qualified status under the Internal Revenue Code. Therefore, the Trustees were required to look to that law and applicable regulations when construing the Plan.

### 4. Compliance with the Internal Revenue Code, Treasury Regulations, and IRS Guidance

The requirements of the Internal Revenue Code, along with the applicable Treasury Regulations and IRS guidance documents submitted by defendants, compel the conclusion that the Service Pension payments to the plaintiffs were impermissible as a matter of law, in light of plaintiffs' age and their continued employment with their former employer.

As noted, Section 29 U.S.C. § 1002(2)(A) states: "A distribution from a plan, fund, or program shall not be treated as made in a form other than retirement income or as a distribution prior to the termination of covered employment solely because such distribution is made to an employee who has attained age 62, and who is not separated from employment at the time of such distribution." Therefore, defendants argue that "both ERISA fiduciaries and courts must interpret a plan document to allow payment of retirement benefits to participants *under* 62 years of age *only* if the participant has had a severance from employment." ECF 46-1 at 21 (emphasis in brief).

Under both 26 U.S.C. § 401(a)(36) and 26 C.F.R. 1.401(a)-1(b)(1)(i), a plan can retain its tax-exempt status if it allows for distributions to employees who have attained age 62 but are still working for the same employer. It follows that, to maintain tax-exempt status, employees under age 62 cannot receive such distributions if they have not separated from employment.

Although not binding, the PLR explicitly states that an "employee who 'retires' with the explicit understanding between employer and employee that upon retirement the employee will

60

immediately return to service with the employer has not legitimately retired and may not qualify for an early retirement benefit under the Plan." This is precisely what occurred here.

Both Taylorson and Chavis intended after early retirement to work for the same employer, Johnson Controls, albeit in different positions than they had held before retirement. Defendants construed and applied the relevant terms in the 2009 Plan so as to comply with applicable IRC requirements, which rendered plaintiffs ineligible for Service Pension benefits because they had not experienced a true separation from employment.

Several other courts have reached similar conclusions, albeit under an abuse of discretion standard rather than a de novo standard. In *Metzgar*, 2019 WL 1428083, plaintiffs contended that, "to the extent § 401(a) and I.R.S. regulations construing § 401(a) refer to an employee's required retirement from employment, such employment is limited to 'covered employment' under the Plan, *i.e.*, employment in the plumbing and steamfitters trade for which employer contributions to the Plan are required. . . and does not extend to [employment] for which contributions to the fund are not required. . . ." *Id.* at *13. That magistrate judge noted that "nothing in the text of § 401(a) recognizes that the term 'retirement' refers exclusively to a withdrawal from work in covered employment as its prerequisite for a valid distribution of early retirement pension payments." *Id.* The court determined that it was an error for defendants to believe that an employee withdrawing from "covered employment" with the expectation that the employee would continue working in non-covered employment satisfied the requirement that an employee separate from employment before receiving pension payments prior to the normal retirement age. *See id.*

And, the court observed that the IRS's discussion of separation from employment in the PLR does not indicate that the issue turns on "whether the employee terminates covered as opposed to non-covered employment under a plan. . . ." *Id.* The *Metzgar* Court said: "Significantly, other

decisions which have addressed this issue, *Meakin* and *Maltese*, have also concluded the I.R.S.'s regulations, rulings, as well as the PLR represent a legally correct analysis of the question." *Id.* at *16.

Plaintiffs in *Meakin*, 2018 W 405009, advanced an argument similar to that of the plaintiffs in *Metzgar*. There, plaintiffs contended that they had legitimately retired when they moved from covered to non-covered employment with the same employer. *Id.* at *7. The court rejected that argument. *Id.* The court also noted that the Trustees were fiduciaries and as such the "actions they took to preserve the tax-exempt status of the trust [were] not unreasonable." *Id.* The Ninth Circuit upheld the district court's decision. *Meakin*, 774 F. App'x 1036.

The district court in *Maltese v. National Roofing Industry*, 2016 WL 7191798 (N.D. WV Dec. 12, 2016), determined that the trustees' interpretation of their plan terms as requiring a complete separation from employment in order to disburse early retirement benefits "was consistent with the Plan's goal of retaining tax-exempt status under section 401(a) of the Internal Revenue Code (26 U.S.C. § 401) and applicable Treasury Regulations." *Id.* at *4. It noted that in the PLR, the IRS concluded that an understanding between an employer and an employee that the employee will "retire" and immediately return to service "does not constitute retirement because the employee does 'not actually separate from service and cease performing services for the employer,' and thus '[s]uch retirements will violate section 401(a) of the Code and result in disqualification of the Plan." *Id.* Therefore, the court concluded that the trustees' decision to suspend benefits was reasonable. *Id.*

Plaintiffs assert: "Defendants cannot self-correct their *perceived* tax qualification failure." ECF 47-1 at 21 (emphasis in brief). They contend that the "IRS' Employee Plans Compliance Resolution System ("EPCRS") prescribes the sole permissible methods for correcting tax-

qualification failures of pension plans." *Id.* According to plaintiffs, only "operational failures" could be self-corrected, and "operational failures" as defined by the EPCRS are failures that result "solely from the failure to follow plan provisions." *Id.* (citing Rev. Proc. 2019-19 § 5.01(2)(b) ("Rev. Proc. 2019-19"). In their view, the only way for the Trustees to correct their tax-qualification failure is "through a formal submission to the IRS under the EPCRS Voluntary Correction Program ("VCP")," which the Trustees have not done. ECF 47-1 at 22.

Defendants counter that they are not required to utilize the IRS's VCP system to self-correct errors. ECF 48 at 17-18. They argue that the "issuance of a Compliance Statement from the IRS would have no practical effect on this matter because the Defendants would have already fulfilled their obligation to correct any errors concerning the continued tax qualification of the Plan as a result of the wrongful distribution of Plaintiffs' retirement benefits." *Id.* In any event, they contend that their self-correction amounts to one of an "Operational Failure" because they were correcting an earlier misinterpretation of the Plan. *See id.* at 18.

The VCP is a voluntary process. Rev. Proc. 2019-19 is couched throughout in permissive language. For example, Section 1.02, "General principles underlying EPCRS," notes that the program was established to promote voluntary compliance "by establishing limited fees for voluntary corrections approved by the Internal Revenue Service. . . thereby reducing employers' uncertainty regarding their potential tax liability and participants' potential tax liability." Section 1.03 provides that under the VCP, a plan sponsor "at any time before audit, *may* pay a limited fee and receive the IRS's approval for correction. . . ." (emphasis added).

Therefore, the VCP is a voluntary system designed to encourage self-correction by limiting fees, sanctions, and overall liability for plans that choose to take advantage of it. However, there is nothing in the language that suggests that it is the exclusive means for plans to self-correct.

Additionally, as discussed above, the Board's decision to suspend the benefits for Taylorson and Chavis and subsequently to deny their appeals constitutes correction of an Operational Failure: the Trustees were interpreting the 2009 Plan to correct a failure to construe the Plan according to its terms, in light of the requirements of the IRC.

Defendants' interpretation of the 2009 Plan, in light of ERISA's policies and applicable portions of the IRC and regulations promulgated thereunder, is correct as a matter of law. Accordingly, I shall deny Plaintiffs' Motion.

### F. Defendants' Motion for Summary Judgment

#### 1.    Count I

As discussed above, defendants' interpretation of the 2009 Plan was correct as a matter of law.  Therefore, I will grant Defendants' Motion with respect to plaintiffs' pension payments prior to their attainment of age 62.  However, there exist questions as to payment of plaintiffs' pension benefits now that have both attained the age of 62.

Under the terms of the 2009 Plan, plaintiffs are entitled to Normal Retirement benefits, without regard to whether they have experienced a separation from employment.  This issue was raised in the Complaint (*see* ECF 1, ¶¶ 106-111), in Plaintiffs' Motion (ECF 45-1 at 10), and in their affidavits.  *See* ECF 45-23, ¶¶ 28-29; ECF 45-24, ¶¶ 28-30.  Plaintiffs assert that although they have both turned 62, their benefits have not been restored.  ECF 45-1 at 10.  But, this issue was not squarely addressed in the briefing.

The Court has not been provided with information as to the current status of plaintiffs' pension benefits.  Therefore, I shall grant Defendants' Motion as to Count I, in part, and deny it, in part.

### 2. Counts II and IV

As indicated, plaintiffs allege breach of fiduciary duty in Counts II and IV. Defendants contend that plaintiffs had actual knowledge of the material facts necessary to lodge a claim for breach of fiduciary duty when the Trustees failed to consider their appeals and render a decision at the December 2012 Board meeting. ECF 46-1 at 27. Therefore, they argue that plaintiffs were "required to file this instant action within three years of that date and are currently out of time." *Id.*

According to plaintiffs, the Board "misrepresented the terms of the governing Plan to Plaintiffs and concealed the actual terms of the governing Plan from Plaintiffs, *through the entire claims review process*." ECF 47-1 at 39 (emphasis in brief). Because of this concealment, plaintiffs contend that their "breach of fiduciary duty claims are governed by the 6-year limitations exception." *Id.* at 40. Further, they argue that "there has not been any discovery regarding when Plaintiffs acquired *actual* knowledge of the Board of Trustees' breach of fiduciary duty." *Id.* (emphasis in brief).

Given the Court's disposition of claims concerning benefits before plaintiffs turned 62, there can be no claim for breach of fiduciary duty on that basis. However, in light of the claim that the Trustees failed to pay benefits after plaintiffs turned 62 years of age, the claim is viable on that basis. As noted, the issue is raised but not addressed in the briefing.

Taylorson, born in 1954, turned 62 in 2016. *See* ECF 46-9 at 2. He avers that his benefits have not been reinstated, despite informing the Board of his birthday "months prior to [his] attaining 62." ECF 45-23, ¶¶ 28, 29. Chavis, born in 1956, turned 62 in July 2018. *See* ECF 24-3 at 13; ECF 45-24 ¶ 28. He avers that his benefits have not been reinstated, despite the fact that his "attorney informed Defendants' attorney that [he] had attained age 62. ECF 45-24, ¶¶ 28, 29.

Section 413 of ERISA, 29 U.S.C. § 1113, "creates a general six year statute of limitations, shortened to three years in cases where the plaintiff has actual knowledge, and potentially extended to six years from the date of discovery in cases involving fraud or concealment." *Browning v. Tiger's Eye Benefits Consulting*, 313 F. App'x. 656, 660 (4th Cir. 2009) (citing *Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir. 1996)). In 1987, Congress amended the statute to require "actual knowledge of the breach or violation." *Browning*, 313 F. App'x. at 660.

In *Intel*, 140 S. Ct. 768, the Supreme Court considered the timeline of an action under ERISA. An ERISA plan participant brought suit against the plan fiduciaries for breach of fiduciary duties by "overinvesting in alternative assets." *Id.* at 774. At issue was whether the participant had actual notice of the breach when he was sent disclosures he could not remember reviewing. *Id.* The Supreme Court concluded that a plan participant does not necessarily have "'actual knowledge' of the information contained in disclosures that he receives but does not read or cannot recall reading." *Id.* at 773. The Court noted: "[I]f a plaintiff is not aware of a fact, he does not have 'actual knowledge' of that fact however close at hand the fact might be." *Id.* at 777 (internal citation omitted).

The Court said, *id.* at 777 (emphasis in *Intel*):

> As presently written, therefore, [the disclosure requirement in ERISA § 1113(2)] requires more than evidence of disclosure alone. That all relevant information was disclosed to the plaintiff is no doubt *relevant* in judging whether he gained knowledge of the information. . . . To meet [the] "actual knowledge" requirement, however, the plaintiff must in fact have become aware of that information.

The Fourth Circuit has emphasized "that 'actual knowledge must be distinguished from constructive knowledge,'" and the existence of actual knowledge "depends largely on the 'complexity of the underlying factual transaction, the complexity of the legal claim[,] and the egregiousness of the alleged violation.' " *Browning*, 313 F. App'x. at 661 (alterations in original)

(quoting *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992)). In *Browning*, the Court found actual knowledge when there was a non-complex transaction, non-complex legal claim, and the alleged violation was egregious. *See Browning*, 313 F. App'x. at 662.

Notably, the Fourth Circuit has said that "the appropriate inquiry is fact-intensive." *Id.* at 661. Additionally, "there cannot be actual knowledge of a violation for purposes of the limitation period unless a plaintiff knows 'the essential facts of the transaction or conduct constituting the violation.'" *Id.* (quoting *Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133, 142 (4th Cir. 2005)). Therefore, to trigger the three-year statute, defendants must be able to show that plaintiffs had actual knowledge of the essential facts that constituted a breach of fiduciary duty. Otherwise, the applicable statute is six years.

Because defendants have moved for summary judgment on this issue, I must construe the facts in the light most favorable to plaintiffs. Any remaining breach of fiduciary duty claim would not have accrued until plaintiffs turned 62 and their pension benefits were not restored. Taylorson turned 62 sometime in 2016 and Chavis turned 62 in July of 2018. Even assuming the three-year limitations period applies, suit was filed on September 13, 2017, well within the three-year period of limitations. Thus, plaintiffs timely brought claims for breach of fiduciary duty on the basis of failure to pay benefits after they turned 62.

### 3.     Count VI

Defendants argue that because they should prevail on the plaintiffs' denial of benefits claims, the remaining counts must be dismissed. ECF 46-1 at 16. Because I will deny Defendants' Motion as to Count I with respect to payments to plaintiffs after they turned 62, and because I will deny Defendants' Motion as to Counts II and IV with respect to these same payments, I will also deny Defendants' Motion as to Count VI, with respect to attorneys' fees.

### III.    Conclusion

For the aforementioned reasons, Plaintiffs' Motion is denied.  Defendants' Motion is granted in part and denied in part as to Count I, and denied as to Counts II, IV, and VI.

A separate Order follows.


Date: March 27, 2020                                    _____/s/_____
                                                                       Ellen L. Hollander
                                                                       United States District Judge